**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.



FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAY 2 4 2018

for CHIEF JUSTICE

This opinion was filed for record

at __8:00 am__ on __May 24, 2018__

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

POPE RESOURCES, LP, a Delaware
limited partnership; OPG PROPERTIES,
LLC, a Washington limited liability
company,

                Respondents,

      v.

THE WASHINGTON STATE
DEPARTMENT OF NATURAL
RESOURCES, a Washington State agency,

                Petitioner.

NO. 94084-3

EN BANC

Filed    **MAY 2 4 2018**

STEPHENS, J.—In concluding that the Department of Natural Resources (DNR) is a potentially liable party under Washington's Model Toxics Control Act (MTCA), ch. 70.105 RCW, the Court of Appeals below rejected the prior interpretation of that statute in *Unigard Insurance Co. v. Leven*, 97 Wn. App. 417, 983 P.2d 1155 (1999) and *Taliesen Corp. v. Razore Land Co.*, 135 Wn. App. 106, 144 P.3d 1185 (2006). *See Pope Res., LP v. Dep't of Nat. Res.*, 197 Wn. App. 409,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

422, 389 P.3d 699 (2016) ("Because the language of the provision in MTCA differs from the language in CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601-9675], *Taliesen*'s and *Unigard*'s holdings relying on an interpretation of CERCLA liability are not persuasive."). We granted review to resolve this split in the Court of Appeals and to provide guidance for interpreting MTCA.

We reverse the Court of Appeals and hold that DNR is not an "owner or operator" of the Port Gamble Bay facility within the meaning of MTCA. As did the courts in *Unigard* and *Taliesen*, we recognize MTCA's affinity with CERCLA, under which the control retained by DNR is insufficient to support its liability for environmental contamination of the Port Gamble Bay facility.

BACKGROUND

Between 1853 and 1995, the Port Gamble Bay facility in Kitsap County operated as a sawmill and forest products manufacturing facility by Pope & Talbot and its corporate predecessors. In 1890, some 37 years after Puget Mill Co., predecessor to Pope & Talbot, began operating the sawmill, the legislature authorized the disposal of certain occupied state-owned aquatic lands, including the tidal lands within Port Gamble Bay. Clerk's Papers (CP) at 249-55. In 1893 and 1913, Puget Mill Co. purchased tidelands around the mill facility and on the east and

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

west sides of Port Gamble Bay from the State of Washington. CP at 266. DNR issued the first lease for Pope & Talbot's use of the Port Gamble Bay submerged lands in 1974. CP at 103.

In 1985, "Pope & Talbot's Board of Directors and shareholders approved a 'Plan of Distribution' . . . to transfer 71,363 acres of its timberlands, timber, land development, and resort businesses in the State of Washington . . . to Pope Resources, a newly formed Delaware limited partnership." *Pope & Talbot, Inc. v. Comm'r*, 162 F.3d 1236, 1237 (9th Cir. 1999). "The Partnership paid no consideration for the Washington Properties," *id.*, although Pope Resources and Olympic Property Group (Pope/OPG) claim they assumed a $22.5 million mortgage in consideration. Appellants' Opening Br. at 5. However, the Ninth Circuit Court of Appeals affirmed the tax court's valuation of the transferred properties at between $46.7 and $59.7 million. *Pope & Talbot, Inc.*, 162 F.3d at 1238, 1242. Pope Resources in turn leased the mill area to Pope & Talbot. CP at 77. Pope & Talbot ceased mill operations in 1995. CP at 231. The record indicates that Pope/OPG now seek to develop their Port Gamble holdings for a large, high-density community with a marina. CP at 153-55.

Contamination of the Port Gamble site stems in part from the operation of sawmill buildings to saw logs for lumber, operation of chip barge loading facilities

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

and a log-transfer facility, particulate sawmill emissions from wood and wood waste burning, in-water log rafting and storage, and creosote treated pilings placed throughout the bay to facilitate storage and transport of logs and wood products. "Logs were generally stored, rafted, and sorted in-water throughout the Bay." CP at 78. It is uncontested that

> DNR did not control the finances of the facility at Port Gamble, manage the employees of the facility, manage the daily business operations of the facility, or have authority to operate or maintain environmental controls at the facility. DNR did not control Pope and Talbot's decisions regarding compliance with environmental laws or regulations, or Pope and Talbot's decisions regarding the presence of pollutants. DNR did not authorize the release of any hazardous substances on this site.

CP at 269.[1]

After entering into a consent decree with the Washington Department of Ecology in 2013 "to provide for remedial action at a portion(s) of the facility . . . where there has been a release or threatened release of hazardous substances," CP at 73, Pope/OPG filed a complaint in 2014 seeking a declaration that DNR is liable for natural resources damages and remedial costs, and for contribution of costs. CP at

---

[1] *See also* CP at 120 ("During the Term of this Lease, Lessee shall have exclusive control and possession of the Property (subject to easements or other land uses that may be granted under Subsection 5.5, and any interference by third parties as identified in Subsection 10.2), and State shall have no liabilities, obligations, control, or responsibilities whatsoever with respect thereto, or with respect to any plans or specifications submitted to State pursuant to this Lease, or improvements or repairs made to the Property or any activity conducted thereon. State's approval or disapproval of any such plans and specifications or improvements shall not render State liable therefore.").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

3-10. The Kitsap County Superior Court granted summary judgment in favor of DNR in 2016. CP at 368-70. The Court of Appeals reversed, holding that DNR is an "owner or operator" with potential liability under MTCA. *Pope Res.*, 197 Wn. App. at 412. DNR appealed, and we granted review. *Pope Res., LP v. Dep't of Nat. Res.*, 188 Wn.2d 1002, 393 P.3d 357 (2017).

## ANALYSIS

MTCA imposes liability for environmental contamination on the "owner or operator" of a subject facility, or any person who owned or operated the facility at the time of the hazardous substance release or disposal. RCW 70.105D.040(1)(a), (b). MTCA "owner or operator" liability extends to the following "person[s]," as defined in RCW 70.105D.020(24): an "individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, state government agency, unit of local government, federal government agency, or Indian tribe." Each liable person "is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances." RCW 70.105D.040(2). Liable persons have a right to seek contribution from other potentially liable persons. RCW 70.105D.080.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

## I. The Court of Appeals Conflated the Terms "Owner" and "Operator" under MTCA

The Court of Appeals erroneously concluded "that DNR is liable under MTCA as an 'owner or operator' of the Site." *Pope Res.*, 197 Wn. App. at 418. At the center of its error lies the conflation of these terms, leading the Court of Appeals to misconstrue DNR's delegated management authority as an "ownership interest" in the Port Gamble Bay facility. Then, relying on this faux ownership interest, the Court of Appeals mischaracterized DNR's leasing authority as indicating operational control over the Pope/OPG facility. *Id.* at 420-21. The result is a patchwork drawn from distinct legal doctrines that fails to adequately describe DNR's role at Port Gamble Bay.

The plain language of MTCA states that an "owner" is "[a]ny person with any ownership interest in the facility." RCW 70.105D.020(22)(a). An "operator" is any person "who exercises any control over the facility." *Id.* Although the terms "owner" and "operator" are joined in the phrase "owner or operator" in MTCA, this does not reduce their independent meaning, given the absence of express legislative intent to alter the distinct real property and business operation legal doctrines corresponding with these terms.

Contrary to the Court of Appeals' view, MTCA follows CERCLA in defining who is liable for environmental contamination. The primary intent of MTCA is that

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"[p]olluters should pay to clean up their own mess. Initiative 97 would make them do that. *Polluters are forced to clean up their wastes.*" *State of Washington Voter's Pamphlet, General Election* 6 (Nov. 8, 1988). MTCA assigns liability to the following persons "with respect to a facility: (a) [t]he owner or operator of the facility; [and] (b) [a]ny person who owned or operated the facility at the time of disposal or release of hazardous substances." RCW 70.105D.040(1). This is substantially the same language used in CERCLA with one exception. *See* 42 U.S.C. § 9607(a)(1) (persons liable include "the owner and operator of . . . a facility"). The parallel construction from the definition of "owner or operator" recurs throughout MTCA, which defines "facilities" by applying this dyad:

> "Facility" means (a) [operational fixtures and assets such as] any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, vessel, or aircraft, or (b) [real property locations and assets such as] any site or area where a hazardous substance, other than a consumer product in consumer use, has been deposited, stored, disposed of, or placed, or otherwise come to be located.

RCW 70.105D.020(8). Other than adding vessels under MTCA, this is substantially the same definition for "facility" under CERCLA, 42 U.S.C. § 9601(9).

The parent statute to MTCA, CERCLA, has consistently been interpreted to avoid fusing the separate legal doctrines that underlie the terms, "owner" and "operator." *See* CRAIG N. JOHNSTON & MELISSA POWERS, PRINCIPLES OF

7

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

ENVIRONMENTAL LAW 162-63 (2016) ("The prima facie elements of ownership liability are generally very straightforward: Does the defendant own the facility . . . . The question of who may qualify as an 'operator' under CERCLA is somewhat trickier."). Because MTCA was heavily patterned after CERCLA, Washington courts have recognized "federal cases interpreting similar 'owner or operator' language in the federal act are persuasive authority in determining operator liability." *Taliesen*, 135 Wn. App. at 127 (citing *Unigard*, 97 Wn. App. at 428).

The Court of Appeals erroneously concluded that DNR has "owner or operator" liability by conflating these distinct statutory terms and entangling independent legal doctrines regarding real property ownership, statutory delegation, and business facilities operations. The court neglected to make concrete findings of any real property ownership interest or any facility-level operational control based on facts in the record. Its reasoning thereby creates the risk that persons with no ownership interest and who lack facility-level operational control may nonetheless be named potentially responsible parties under MTCA.[2] When MTCA is properly construed, it is clear that DNR, regardless of whether it is a person under MTCA, is neither an "owner" nor an "operator" subject to liability for the Port Gamble Bay facility.

---

[2] The dissent heightens this risk by erroneously suggesting that the burden is on DNR to prove it is *not* an "owner" or "operator." *See* dissent at 4.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

## II. DNR Is Not Liable under MTCA as an "Owner" at Port Gamble Bay

The Court of Appeals incorrectly held that DNR has an "ownership interest" in the Port Gamble Bay facility. *Pope Res.*, 197 Wn. App. at 420. In so doing, the court interposed *ownership* attributes into the State's delegation of aquatic lands *management* to DNR. *See id.* at 419 (wrongly assuming that delegated responsibility to manage aquatic lands resembles a property right and, consequently, an "ownership interest" in the Pope/OPG facility). Despite a record bereft of any deeds, grants, patents, or other instruments conveying "any ownership interest" to DNR, the Court of Appeals deemed DNR an owner by mistaking its delegated management authority for a real property right, and then concluding that "DNR's authority includes those rights associated with an ownership interest." *Id.* at 420. This was error.

It is undisputed that the State of Washington owns the aquatic lands at Port Gamble Bay. Indeed, Pope/OPG conceded as much and also acknowledged before the trial court that "the State of Washington cannot be liable under MTCA." CP at 308; *see also Pope Res.*, 197 Wn. App. at 418 (noting parties' stipulation that the State owns lands at Port Gamble Bay). Pope/OPG nonetheless sued DNR, arguing that "DNR has every incident of ownership other than fee." Resp'ts' Suppl. Br. at 10. Not so; the legislature reserved for the *State* the full bundle of rights comprising

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

an ownership interest when it declared that "the state owns these aquatic lands in fee and has delegated to the department the responsibility to manage these lands for the benefit of the public." RCW 79.105.010; *see also* RCW 79.105.020 (the purpose of the aquatic lands statutes "is to articulate a management philosophy to guide the exercise of the state's ownership interest and the exercise of the department's management authority"). DNR's interest is solely as the State's management agent.

The limitation on DNR's role has constitutional roots because the State of Washington, not DNR, owns the beds and shores of all navigable waters in this state. CONST. art. XVII, § 1. Upon entering the Union, the State of Washington obtained title to the beds of its navigable waters under the equal footing doctrine, U.S. CONST. art. IV, § 3, cl. 1. Under this doctrine, "the people of each of the Thirteen Colonies at the time of independence 'became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government.'" *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 283, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) (quoting *Martin v. Lessee of Waddell*, 41 U.S. (16 Pet.) 367, 410, 10 L. Ed. 997 (1842)). The Court later concluded that states entering the Union after 1789 did so on an "'equal footing'" with the original states,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

thereby granting similar ownership over these "sovereign lands." *Id.* (citing *Pollard v. Hagan,* 44 U.S. (3 How.) 212, 228–229, 11 L. Ed. 565 (1845).

While the State owns aquatic lands in fee, it has delegated to DNR the responsibility to manage such lands "for the benefit of the public." RCW 79.105.010. The public benefits "are varied and include: (1) [e]ncouraging direct public use and access; (2) [f]ostering water-dependent uses; (3) [e]nsuring environmental protection; [and] (4) [u]tilizing renewable resources." RCW 79.105.030. Generating revenue in a manner consistent with these other purposes is also a public benefit. *Id.* Log storage is an expressly authorized purpose for state-owned aquatic lands, subject to DNR's management. RCW 79.105.250. "State-owned aquatic lands" "means all tidelands, shorelands, harbor areas, the beds of navigable waters, and waterways owned by the state and administered by the department or managed under RCW 79.105.420 by a port district. 'State-owned aquatic lands' does not include aquatic lands owned in fee by, or withdrawn for the use of, state agencies other than the department." RCW 79.105.060(20).

The State's ownership of aquatic lands reflects its obligations under the public trust doctrine. Rooted in Const. art. XVII, § 1, "[t]he public trust doctrine protects 'public ownership interests in certain uses of navigable waters and underlying lands, including navigation, commerce, fisheries, recreation, and environmental quality.'"

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.,* 94084-3

*Citizens for Responsible Wildlife Mgmt. v. State,* 124 Wn. App. 566, 571, 103 P.3d 203 (2004) (internal quotation marks omitted) (quoting *Weden v. San Juan County,* 135 Wn.2d 678, 698, 958 P.2d 273 (1998)). "In other words, the public trust doctrine grants the state dominion and sovereignty over these lands to hold in trust for the public." *Id.* (citing *Caminiti v. Boyle,* 107 Wn.2d 662, 669, 732 P.2d 989 (1987)). Const. art. XVII, § 1 was "a formal declaration by the people of rights which our new State possessed by virtue of its sovereignty, and which declaration had the effect of vesting title to such lands in the state." *Caminiti,* 107 Wn.2d at 666-67 (footnote omitted).

The public trust duty "devolves upon the State, not any particular agency thereof." *Rettkowski v. Dep't of Ecology,* 122 Wn.2d 219, 232, 858 P.2d 232 (1993). Through the aquatic lands statutes, the State has granted sovereign powers to DNR for protection of the State's interest in the trust. *See, e.g., Caminiti,* 107 Wn.2d at 672 ("The statute also specifically authorizes an agency of the State, the Department of Natural Resources, to regulate the docks through its powers of revocation to protect waterward access and ingress rights of other landowners and the public health and safety.").

In 1953, the legislature specifically delegated to DNR the authority to lease state bedlands. CP at 263. Through the exercise of this delegated power, DNR

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

executed its first lease for the Port Gamble Bay area with Pope & Talbot in 1974. CP at 267. DNR does not generate profits from leases of state-owned aquatic lands. Rather,

> [a]fter deduction for management costs as provided in RCW 79.64.040 and payments to towns under RCW 79.115.150(2), all moneys received by the state from the sale or lease of state-owned aquatic lands and from the sale of valuable material from state-owned aquatic lands shall be deposited in the aquatic lands enhancement account which is hereby created in the state treasury. After appropriation, these funds shall be used solely for aquatic lands enhancement projects; for the purchase, improvement, or protection of aquatic lands for public purposes; for providing and improving access to the lands; and for volunteer cooperative fish and game projects.

RCW 79.105.150(1).

DNR executes its leasing authority with a view toward the State's duty to protect the public trust. The "1992 Memorandum of Agreement Concerning Contaminated Sediment Source Control, Cleanup, and Disposal" (MOA) between DNR and the Department of Ecology recommended indemnity language, concerning hazardous, toxic, or harmful substances, for DNR to include in its leases when exercising its delegated management powers over state-owned aquatic lands. CP at 306. The lease agreements between DNR and Pope & Talbot state:

> Lessee shall be fully and completely liable to State, and shall waive any claims against State for contribution or otherwise, and shall indemnify, defend, and save harmless State and its agencies, employees, officers, directors, and agents with respect to any and all liability, damages (including damages to land, aquatic life, and other natural resources), expenses, causes of action, suits, claims, costs (including testing, auditing, surveying, and investigation costs), fees (including attorneys' fees and costs), penalties (civil and criminal), and response, cleanup, or remediation costs assessed against

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

or imposed upon Lessee, State, or the Property, as a result of Lessee's control of the Property, or Lessee's use, disposal, transportation, generation and/or sale of Hazardous Substances or that of Lessee's employees, agents, assigns, sublessees, contractors, subcontractors, licensees, permittees, or invitees, and for any breach of this [agreement].

CP at 120.

This lease provision is wholly consistent with serving the public interest under the public trust doctrine test we have developed.[3] *See Caminiti*, 107 Wn. 2d at 670. In *Caminiti*, we considered whether a statute that allowed DNR to authorize no-cost residential docks abutting state tidelands and shorelands violated the public trust. *Id.* at 666. We applied the following inquiry: "(1) whether the State, by the questioned legislation, has given up its right of control over the jus publicum[, an overriding public authority interest over navigable waters and lands beneath them,] and (2) if so, whether by so doing the State (a) has promoted the interests of the public in the jus publicum, or (b) has not substantially impaired it." *Id.* at 670. We concluded that the public trust was not violated because the statute at issue in *Caminiti*

---

[3] Pope/OPG argue that the lease indemnification language conflicts with the public interest and is evidence that DNR is no different from a private landowner seeking to limit its liability exposure. They go so far as to criticize DNR's public interest argument as disingenuous. Resp'ts' Answer to Pet. for Review at 10. However, it is well understood that "DNR could have (and presumably did) use indemnity agreements and insurance to protect itself from liability resulting from lessees' activities and can continue to protect itself going forward by using similar measures." Amicus Curiae Br. Submitted by Jolene Unsoeld, Janice Niemi & David Bricklin, No. 47861-7-II, at 12-13. This is sound management practice and not inconsistent with the State's objectives under the public trust doctrine.

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

adequately protected public harbors and incorporated protections of the trust through the Shoreline Management Act of 1971, RCW 90.58.140(1), the Planning Enabling Act of the State of Washington, ch. 36.70 RCW, the hydraulics act, RCW 77.55.021, and local regulation. *Id.* at 672-73. In addition, the statute promoted public use of the trust consistent with the referenced legal requirements, while not conveying trust ownership to private parties. *Id.* at 673-74.

The Court of Appeals later applied the *Caminiti* test to a state agency decision regarding whether DNR's procedures for auctioning geoduck harvest rights violated the public trust doctrine. *Wash. State Geoduck Harvest Ass'n v. Dep't of Nat. Res.*, 124 Wn. App. 441, 101 P.3d 891 (2004). The court concluded that the public trust was not violated because no title to state land was conveyed and DNR reserved the right to suspend commercial harvests if needed. *Id.* at 452. In addition, DNR established procedures that, in combination with federal law and industry standards, provided a relevant regulatory framework to ensure continued State control over its geoduck resources. *Id.*

DNR's actions in this case reflect a similar effort to safeguard the public trust. As in *Caminiti* and *Washington State Geoduck Harvest Ass'n*, the State, through its management agent DNR, conveyed occupancy to Pope & Talbot in term leases, rather than a fee title conveyance, for a facility the State inherited at statehood. DNR

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

introduced requirements in the leases to prevent accumulation of wood waste and hazardous materials, and required indemnification by the lessee pursuant to the MOA with the Department of Ecology. CP at 103-06, 111-21, 306-07. Any revenue it collected was dedicated to the enhancement of aquatic lands. RCW 79.105.150(1). And as the State's designated manager, DNR, through the leases, clearly delineated the operational control and MTCA liability for the leased facility to Pope & Talbot, consistent with the Department of Ecology MOA. CP at 119-20.

This allocation of responsibility is consistent with MTCA's goal to ensure that polluters pay. At Port Gamble Bay, DNR also required compensation from Pope & Talbot for lost income from reduced geoduck production associated with a 1975 sewer outfall lease. CP at 126-32. Port Gamble Bay restoration is in progress, in part through Pope/OPG's consent decree with the Department of Ecology pursuant to MTCA. There may be a temporary loss of some trust resources, as in the geoduck lease areas that may need decades of recovery time prior to any resumption of leasing. *See Wash. State Geoduck Harvest Ass'n*, 124 Wn. App. at 445. However, the regulatory and legal framework in this case resembles the protective legal landscapes in *Caminiti* and *Washington State Geoduck Harvest Ass'n*.

The Court of Appeals erred by misidentifying DNR's delegated authority as indicating a conveyed property right under property law doctrines. However, the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

delegation to DNR merely authorizes leasing of state-owned submerged lands consistent with public uses. The record lacks evidence that the State ever conveyed to DNR "any ownership interest" in Port Gamble Bay. When the legislature wishes to define an agency as a landowner, it knows how to do so. *See Oberg v. Dep't of Nat. Res.*, 114 Wn.2d 278, 282, 787 P.2d 918 (1990) (noting the legislature's "express inclusion of DNR within the landowner category" (citing ch. 76.04 RCW)). Further, when the legislature wishes to convey land, it knows how to authorize it. *See* RCW 79.105.400 ("The department may exchange state-owned tidelands and shorelands with private and other public landowners if the exchange is in the public interest and will actively contribute to the public benefits established in RCW 79.105.030."); *see also* RCW 79.125.200(2) ("Notwithstanding any other provision of law, from and after August 9, 1971, all state-owned tidelands and shorelands enumerated in subsection (1) of this section shall not be sold except to public entities as may be authorized by law and they shall not be given away."). The Court of Appeals erred when it concluded that the legislature conferred "any ownership interest" to DNR. *Pope Res.*, 197 Wn. App at 420.[4]

---

[4] Our conclusion that DNR is not subject to MTCA liability as an "owner" should not be misunderstood as disclaiming any state agency liability under MTCA. *See* Br. of Amicus Curiae Cities of Seattle, Tacoma & Bellingham, & Wash. Ass'n of Mun. Att'ys at 9-10 (asking court to "confirm that DNR is not exempt from liability under the statute"). Our decision does not alter MTCA liability for state agencies. Instead, we conclude, based

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

*III.    DNR Is Not Liable under MTCA as an "Operator" at Port Gamble Bay*

The Court of Appeals also erred in holding DNR is an "operator" for MTCA purposes at the Port Gamble Bay facility. It wrongly conflated the distinct statutory terms "owner" and "operator" and their underlying doctrines in property and business/agency law, implying that delegated authorities that resemble property interests can thereby resemble operational control that triggers MTCA liability. The court wrongly seized on DNR's management role over aquatic lands and, without reference to legal authority, equated this role with having operational control over the Pope/OPG facility.[5] *Pope Res.*, 197 Wn. App. at 420-21. These concepts are distinct.

"DNR is a creature of statute and derives its power from the legislature." *Pope Res.*, 197 Wn. App. at 426 (Melnick, J., dissenting).[6] The legislature delegated only

on these circumstances, that DNR is not the "owner" of state-owned submerged lands but is solely the State's managing agent.

    [5] In the process, the Court of Appeals defined a "'general manager' as a person who administers or supervises the affairs of an organization, 'who has overall control' of an organization." *Pope Res.*, 197 Wn. App. at 421 (quoting BLACK'S LAW DICTIONARY 1104 (10th ed. 2014)). Although the court identified DNR as possessing authority to manage state-owned aquatic lands, it never made a factual finding that DNR exercised operational control over the Port Gamble Bay facility.

    [6] *See Pope Res.*, 197 Wn. App. at 426 (Melnick, J., dissenting) ("'An agency may exercise only those powers conferred by statute and cannot authorize action in absence of statutory authority.'" (quoting *Northlake Marine Works, Inc. v. Dep't of Nat. Res.*, 134 Wn. App. 272, 282, 138 P.3d 626 (2006))); *id.* ("'DNR has been granted authority to manage state aquatic lands.'" (quoting *Northlake Marine Works, Inc.*, 134 Wn. App. at 287)).

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

the authority to manage state-owned aquatic lands, without a "general manager" delegation to DNR, let alone the appropriation of "any control" over private Pope/OPG assets. Therefore, if we focus only on control and set aside the Court of Appeals erroneous designation of DNR as an "owner," under the court's test it would not require much to incur "operator" liability under MTCA. Any entity with delegated management responsibility for some aspect of state lands could qualify, as could any entity with some power to control activities at the site. Indeed, as DNR notes in responding to an amicus brief by Ecology that reflects the Court of Appeals' view:

> One of the side effects of Ecology's argument is that it, too, could have liability as an "owner or operator" under MTCA. As Ecology argues, a person can "exercise[] control" by choosing to limit or not limit the uses to which a facility can be put. Br. of Ecology at 6. At Port Gamble, it was Ecology and its predecessor, the Pollution Control Commission, that had the authority to limit, or choose not to limit, the pollution from the mill.

DNR's Answer to Amicus Br. of Dep't of Ecology at 5 (alteration in original). It should give pause that the agency charged with naming potentially liable parties could actually be one under the Court of Appeals' minimalist test for operator liability. *See Pope Res.*, 197 Wn. App. at 423.[7]

---

[7] Amicus Curiae cities of Seattle, Tacoma, and Bellingham remind us that Ecology is entitled to deference when interpreting an ambiguous statute governing its delegated authority. Br. of Amicus Curiae Cities of Seattle, Tacoma, & Bellingham & Wash. Ass'n of Mun. Att'ys at 8. However, "[t]he plain language of RCW 70.105D.020(22) is unambiguous." *Pope Res.*, 197 Wn. App. at 420; *see also id.* at 426 ("Although the

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

We reject the Court of Appeals' approach in favor of that taken by the courts in *Unigard* and *Taliesen*, which properly interpret MTCA to align with CERCLA. In the context of shareholder liability and the assignment of insurance benefits and indemnification against liability, the Court of Appeals in *Unigard* found CERCLA's test for determining "operator" liability persuasive. 97 Wn. App. at 428. In the context of subcontractor liability, the Court of Appeals in *Taliesen* concluded that a contract drill operator under the supervision of an engineering firm was not liable for a ruptured tank, even though he had mechanical control over the drill, because the contractor had no authority regarding where to drill—this authority resided with the engineering firm. *Taliesen*, 135 Wn. App. at 128. The court found the interpretation of organizational operations under CERCLA persuasive:

> "In a mechanical sense, to 'operate' ordinarily means '[t]o control the functioning of; run: operate a sewing machine.' And in the organizational sense more obviously intended by CERCLA, the word ordinarily means '[t]o conduct the affairs of; manage: operate a business.' So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that

majority does not distinguish between the terms 'owner' and 'operator,' the plain language of the statute at issue clearly differentiates between the two.") (Melnick, J., dissenting). Ecology's interpretation risks distorting the plain-language definitions of MTCA in situations similar to this case by injecting delegation and real property doctrines into corporate and proprietary rights regarding operational control. *See* Amicus Br. of Dep't of Ecology at 5-6. This departure from plain meaning could render operational elements of the statute superfluous and lead to unintended, if not absurd, consequences, thus obviating the rationale for deference.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."

*See id.* (quoting *United States v. Bestfoods,* 524 U.S. 51, 66-67, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998)); *see also Unigard,* 97 Wn. App. at 429 (finding CERCLA interpretation "applicable" in that case).

Pope/OPG argue that the "Court of Appeals' conclusion that DNR 'exercised *any* control' over the facility in this case hinged, in part, on DNR's role in allowing and leasing for log storage, which caused pollution." Resp'ts' Answer to Pet. for Review at 20 n.9 (emphasis added) (citing *Pope Res.,* 197 Wn. App. at 420-421). But, as Judge Melnick observed in dissent, "'The persuasive authority of the federal cases demonstrates that the key word in our state statute is "control," not "any."'" *Pope Res.,* 197 Wn. App. at 428-29 (quoting *Taliesen,* 135 Wn. App. at 128). Because the term "control" is not defined in the statute, it must be given a judicial interpretation. The proper judicial interpretation is that set forth in both *Taliesen* and *Unigard.*

These cases correctly read MTCA to follow the CERCLA test, under which "'an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.'" *Taliesen,* 135 Wn. App. at 128 (quoting *Bestfoods* 524 U.S. at 66). Here, DNR did not fulfill this sort of business management role directly over the facility. Instead, it was Pope & Talbot that executed those operational and

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

"general manager" roles at the Port Gamble Bay facility. The Port Gamble Bay lease expressly assigned operational control to Pope & Talbot. CP at 120. DNR's role was to manage the site on behalf of the state.[8]

Given the facts at Pope/OPG's Port Gamble Bay facility, DNR is not an operator under MTCA. In holding to the contrary, the Court of Appeals rejected the interpretation of the operative terms in MTCA set forth in *Taliesen* and *Unigard*. *Pope Res.*, 197 Wn. App. at 422. Despite the court's statement that these cases are "distinguishable," the only distinction offered is a different interpretation of "control" under MTCA to support operator liability. *Id.* The court found sufficient control based on DNR's role as the State's designated manager and lessor of aquatic lands, but this is too slim a reed on which to hang MTCA liability. It does not amount to necessary *facilities operations* control. We follow prior cases applying the

---

[8] The MOA reflects this understanding: "Ecology recognizes that DNR may have reasonable defenses based on not being an 'owner-operator,' having an 'innocent landowner' status, etc., at any given cleanup site. These 'reasonable' defenses may apply to situations where DNR did not: control the finances of the facility, manage the employees of the facility, manage the daily business operations of the facility, or have authority to daily operate/maintain environmental controls at the facility." CP at 289. As Judge Melnick noted in his dissent, "This language in the MO[A] evinces Ecology's recognition that DNR's role as a manager was to act as the public's custodian of the land, and that it would not be liable under MTCA unless it played an active role in controlling the operation of the facility." *Pope Res.*, 197 Wn. App. at 428. The Department of Ecology insists that Judge Melnick's conclusion "does not represent Ecology's agreement with, or assent to, DNR's argument in this case." Amicus Curiae Br. of Dep't of Ecology at 18. Nonetheless, the MOA statement indicates recognition of DNR's defenses to MTCA liability premised on not having facility-level control relating to polluting activities.

22

*Pope Resources, LP, et al. Dep't of Nat. Res.*, 94084-3

CERCLA control test to MTCA and hold DNR did not possess the requisite level of control to support "operator" liability.

CONCLUSION

DNR is neither an "owner" nor an "operator" of the Port Gamble Bay facility for purposes of MTCA. We reverse the Court of Appeals and reinstate the superior court judgment in favor of DNR.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. Dep't of Nat.* Res., 94084-3

_Stephens, J._

WE CONCUR:

_Fairhurst, C.J._            _Wiggins, J._

_Johnson, J._

_Madsen, J._

_Owens, J._

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pope Resources, LP, et al. v. Dep't of Natural Resources* (González, J., dissenting)

No. 94084-3

GONZÁLEZ, J. (dissenting)—The Model Toxics Control Act (MTCA), chs. 70.105 and 82.21 RCW, sets strict cleanup standards to ensure the protection of human health and the environment. The Department of Natural Resources (DNR) knew its tenant was contaminating the state's waters and did nothing. The majority holds DNR is neither an owner nor an operator and therefore is not liable under MTCA. I disagree. The majority's interpretation of MTCA owner *or* operator liability undermines both the act's plain language and its strict liability scheme. MTCA reflects an intentional policy choice that Washington voters made in 1988 to hold those who have "any ownership interest in the facility *or* who exercise[] any control over the facility" strictly liable. RCW 70.105D.020(22)(a) (emphasis added); *see generally State of Washington Voters Pamphlet, General Election* 6 (Nov. 8, 1988) (*Voters Pamphlet*) ("Cleanups, not lawsuits. [Initiative]-97 makes cleanups happen now—not later. The initiative prohibits polluters from filing lawsuits that delay cleanups."). DNR's power to exclude,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

execute leases, and police violations amply constitutes "any control over the facility," and thus DNR was liable as an "operator" of the site under MTCA.[1] RCW 70.105D.020(22)(a). As the majority concludes otherwise, I respectfully dissent.

MTCA broadly defines an "owner or operator" as "any person with any ownership interest in the facility or who exercises any control over the facility." RCW 70.105D.020(22)(a). The statute also explicitly includes state government agencies in its definition of "person." RCW 70.105D.020(24). The majority ignores this plain language and redefines "operator" liability with a narrower standard taken from the judicial interpretation of the federal statute that was the model for MTCA, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675. Under CERCLA, "'an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.'" Majority at 21 (internal quotation marks omitted) (quoting *Taliesen Corp. v. Razore Land Co.*, 135 Wn. App. 106, 128, 144, P.3d 1185 (2006)).

---

[1] We do not need to resolve whether DNR had an "ownership interest" in the contaminated site because DNR is liable for remediation costs as an "operator." Nevertheless, because I disagree with the premises on which the majority relies, I discuss ownership briefly.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The majority relies on CERCLA jurisprudence simply because the Court of Appeals in *Unigard*[2] and *Taliesen*[3] did so. Majority at 20. Under CERCLA, as interpreted in *United States v. Bestfoods*, 524 U.S. 51, 66, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998), and applied in *Unigard* and *Taliesen*, "an operator must 'manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.'" *Unigard*, 97 Wn. App. at 429 (quoting *Bestfoods*, 524 U.S. at 66-67); *see also Taliesen,* 135 Wn. App. at 127-28; 42 U.S.C. 9601(20)(A). But *Bestfoods* and its CERCLA analysis should not apply here. We are not bound by the Court of Appeals decisions in *Unigard* and *Taliesen,* and we have compelling state law reasons to depart from them.

Although MTCA was heavily patterned after CERCLA, the statute's definitions of "owner or operator" are not the same as MTCA's. *Compare* 42 U.S.C. § 9601(20) ("[t]he term 'owner or operator' means . . . in the case of an onshore facility or an offshore facility, any person owning or operating such

---

[2] *Unigard Ins. Co. v. Leven*, 97 Wn. App. 417, 429, 431, 983 P.2d 1155 (1999) (the lessor was liable under MTCA, but Leven as a shareholder of the company possessing the lease was not an owner or operator because he did not "participate in, or actually exercise control over, the operations of the facility.").

[3] 135 Wn. App. at 127-28 (the lessor of the property was liable under MTCA, but the project's drilling subcontractor was not liable as an operator because at the time of drilling, he had no control over where to drill or how deep).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

facility"), *with* RCW 70.105D.020(22)(a) ("any person with any ownership interest in the facility or who exercises any control over the facility"). Differences in language between a federal statute and our local equivalent are presumed to be intentional and reflect a different intent. *Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 427-28, 833 P.2d 375 (1992); *see also Seattle City Light v. Dep't of Transp.*, 98 Wn. App. 165, 170, 989 P.2d 1164 (1999) (MTCA makes strict and joint and several liability express). The majority does not offer a compelling reason to depart from these precedents. Its reliance on federal law is misguided.

Under the federal standard, as interpreted by the majority, DNR cannot be liable because the agency did not make business decisions for the company leading to the contamination. Majority at 21 ("'an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility'" (internal quotation marks omitted) (quoting *Taliesen*, 135 Wn. App. at 128)). This is incorrect. To escape liability under MTCA in this case, DNR would have to establish that it is neither an "owner" nor an "operator." RCW 70.105D.020(22)(a). The majority focuses on whether a state agency could be liable as an "owner" with an "ownership interest." Majority at 16-17; *see* RCW 70.105D.020(22)(a). Essentially, it determines that a state agency cannot be held liable as an "owner" because the agency is merely a lessor for the property owned by the state. Majority at 16-17. But MTCA clearly contemplates that state government

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

agencies can be owners for purposes of the act, despite the majority's contention that an "owner" must hold a deed. *Id*. at 9. *But see* RCW 70.105D.020(22)(a), (24) ("[a]ny person with any ownership interest in the facility or who exercises any control over the facility"; "'[p]erson' means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, state government agency, unit of local government, federal government agency, or Indian tribe"). Under the majority's interpretation of the term "owner," its explanation of the State's constitutional ownership of the public trust, and its ability to delegate managerial duties, a state agency could never be an "owner" under MTCA. However, legislative enactments suggest otherwise. *See, e.g.,* LAWS OF 2005, ch. 155, § 121 (appropriating funds to DNR for "settlement costs for aquatic lands cleanup"), ch. 518, § 1205 (appropriating funds to DNR to settle MTCA litigation brought against DNR by a private party). Washington State has never required title to be transferred to a government agency for that government agency to be liable as an owner. *Cf. Wasser & Winters Co. v. Jefferson County*, 84 Wn.2d 597, 600, 528 P.2d 471 (1974) (title is not the only indicia of ownership). Nonetheless, it is unnecessary to determine if DNR is liable as an owner because DNR is clearly liable as an operator.

DNR is undoubtedly liable as an "operator" under MTCA. DNR's ability to exercise the right of exclusion, execute leases, attach conditions to the leases, and

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

police violations constitutes "*any* control over the facility." RCW 70.105D.020(22)(a) (emphasis added). Holding DNR strictly liable here will ensure state agencies enforce their covenants and prevent pollution that they would otherwise be partly responsible for, as the voters intended. RCW 70.105D.020(24); *see also* Debra L. Stephens & Bryan P. Harnetiaux, *The Value of Government Tort Liability: Washington State's Journey from Immunity to Accountability*, 30 SEATTLE U. L. REV. 35, 59 (2006) ("any suggestion that tort liability is not an impetus for change in the context of governmental conduct rests on the doubtful premise that the government is uniquely unable to reform"). Voters approved MTCA to "eliminate[ ] polluters' loopholes." *Voters Pamphlet, supra*, at 6.

MTCA does not specifically define the term "control," so we look to its usual and ordinary meaning. *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002). "Control" means the "power or authority to guide or manage : directing or restraining domination." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 496 (1971); *see also* BLACK'S LAW DICTIONARY 403 (10th ed. 2014) ("control" means "[t]o exercise power or influence over"). DNR's ability to lease aquatic land amounts to *any* control of the facility. As the majority explains, the legislature

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

explicitly delegated to DNR the duty to manage aquatic lands, including the Port Gamble Bay site. Majority at 10 (citing RCW 79.105.010).

DNR undertook its duty to affirmatively manage the 72 acres of state-owned aquatic land. It executed three leases for the 72-acre shoreline over approximately 20 years. The first lease, signed in 1974, allowed Pope and Talbot to store, raft, and boom logs on about 70 acres of the land. Provisions in the 1974 lease required Pope and Talbot to "provide facilities for lowering logs into the water without tumbling, which loosens the bark." Clerk's Papers at 105. Such handling minimizes wood waste. When wood waste breaks down, it releases sulfide and ammonia, which are harmful to bottom-dwelling creatures. Wood waste also affects sediment by smothering aquatic habitat and bottom-dwelling creatures, such as clams.

In 1991, DNR removed the protective provisions and identified the bay as an ideal place for log storage in the renewed lease agreement with Pope and Talbot. Toxic wood waste inevitably corresponds with log storage, and DNR knew that Pope and Talbot had been polluting in Port Gamble Bay. *See id.* at 134 (internal memorandum recognizing contamination problems created by wood waste from Pope and Talbot's operations). Yet, DNR's lease with Pope and Talbot expressly authorized overwater log storage in a specific area of the bay that DNR determined

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to be "highly suitable" for that purpose. *Id.* at 39. DNR continued to collect rent while failing to mitigate the damage or deter pollution.

DNR exercised control as an operator. MTCA specifies that liability attaches when there is "*any* ownership interest" or "*any* control over the facility." RCW 70.105D.020(22)(a) (emphasis added). The majority's interpretation of MTCA owner *or* operator liability undermines the act's plain language and strict liability scheme. Plainly, MTCA defines "owner or operator" liability more broadly than CERCLA. Through its ability to exclude, execute leases, and police violations, which constitutes "any control over the facility," DNR was liable as an "operator" of the site under MTCA. Accordingly, I respectfully dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

González, J.

_____