IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PORT OF ANACORTES, a Washington municipal corporation,<br><br>               Respondent,<br><br>v.<br><br>FRONTIER INDUSTRIES, INC. a Washington, corporation; EINO "MIKE" JOHNSON and LORIE A. JOHNSON, a married couple; ITOCHU INTERNATIONAL, INC., a foreign corporation;<br><br>               Petitioners,<br><br>INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation; INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation; ACE USA INSURANCE a Pennsylvania corporation; THE CHUBB CORPORATION, a Pennsylvania corporation.<br><br>               Defendants. | No. 78726-8-I<br><br>DIVISION ONE<br><br><br>PUBLISHED OPINION<br><br><br><br><br><br><br><br><br><br>FILED: August 19, 2019 |

CHUN, J. — The Port of Anacortes filed suit against defendants[1] under the Model Toxics Control Act (MTCA), which imposes strict liability on any owner or operator of a facility "at the time of disposal or release of . . . hazardous substances." RCW 70.105D.040(1)(b). Defendants' activities at the Port's log handling facility resulted in the accumulation of significant amounts of wood

---

[1] "Defendants" refers to Petitioners Frontier Industries, Inc., Eino "Mike" Johnson, Lorie A. Johnson, and Itochu International, Inc.

debris in the marine environment. Decomposition of such debris in the marine environment releases hazardous substances such as ammonia, benzoic acid, and phenols. Moreover, such hazardous substances existed in the water at the cessation of defendants' activities at the Port. This indicates that a release of hazardous substances occurred during defendants' tenure as operators of the facility. Therefore, we affirm the trial court's denial of defendants' joint motion for summary judgment.

I.
## BACKGROUND

The Port serves as a Washington port district and owns upland and aquatic property on Guemes Channel in Anacortes, Washington. The Port purchased the site in 1965. The property includes Pier 2, a deep-water marine terminal, and a "round log" handling facility. Round logs have had their leaves and branches removed but maintain their bark. The round log handling facility consists of the upland "log yard" and the "log pocket" in a small embayment in the water. Log handling occurred at this site for approximately four decades, from the mid-1960s to 2004.

From 1994 to 1997, defendant Frontier Industries, owned by Mike Johnson, leased the log yard and log pocket for log handling. Defendant Itochu International, Inc., a Japanese trading firm, also used the log handling facility to export logs to Japan. In 1997, log handling ceased for a time due to a downturn in the round log export business. Exports resumed later that year, and Johnson

entered an agreement with the Port for Itochu to serve as the exclusive round log user of the Port's facility. The Port closed the log handling facility in 2004.

Defendants handled tens of millions of board feet of round logs at the Port facility. A tugboat would pull large rafts, composed of many bundles of logs, into the log pocket. The tugboat would then deposit the logs in a north-south position within the log pocket. During low tide, the logs typically rested on the bottom of the log pocket. Removal of the logs required east-west positioning. A small gasoline-powered boat called a "log bronc" moved the rafts around inside the log pockets to reorient them. When the logs were properly situated, a large machine called a "Wagner" would go to the log pocket and retrieve bundles of logs with its hydraulic claws.

During this process, the logs shed bark while in the log pocket. Shedding occurred because the logs soaked in the salt water and rubbed and crashed against each other and the machinery. The shed bark deposited on the bottom of the log pocket.

Studies dating back to 1984 show that sediment with 20 percent wood waste by volume can cause a negative impact on the marine environment.[2] "Wood waste leaches and/or degrades into some compounds that can be toxic to aquatic life, such as phenols and methylated phenols, benzoic acid and benzyl alcohol, terpenes, and tropolones."[3] Wood debris decomposes into byproducts

---

[2] CP 287.
[3] CP 296-97.

"such as sulfides, ammonia, and phenols, which can cause or contribute to toxicity."[4] Additionally, "TVS [total volatile solids] and sulfides are known by-products of wood waste decomposition in the marine environment that are toxic to aquatic life."[5]

After the facility's closure, the Port assessed the environmental impacts of the log handling activities. Surface sediment samples contained contaminants such as benzene derivatives. The investigation also included the digging of eight test pits in the marine sediment to two feet below the mudline. All eight pits confirmed the presence of wood debris, with four of the test pits exceeding 50 percent wood waste by weight. The layer of deposited wood debris ranged in thickness from 11 inches to two feet. Two of the pits showed approximately 75 percent wood waste through two feet of sample sediment.

In 2008, the Washington State Department of Ecology (Ecology) required the Port to conduct chemical and biological toxicity testing to determine if the log pocket's wood waste posed an environmental risk. The testing found that the log pocket sediment samples contained higher concentrations of total sulfides than typically found in the Puget Sound. Additionally, the sediment samples failed to meet Ecology's criteria for benthic[6] abundance. Subsequent investigations

---

[4] CP 288.

[5] CP 291.

[6] "Benthic" is defined as "of, relating to, or occurring on the bottom underlying a body of water." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 204 (2002). An expert for the Port described the importance of the benthic community as follows: "Benthic organisms, or benthos, are organisms that live on or near the sediment surface in a marine environment. A healthy and

4

provided additional evidence of adverse environmental effects from wood debris. In addition to wood waste, sediment samples contained metals, benzoic acid, dioxins, and furans in amounts exceeding required cleanup levels.

In April 2014, Ecology issued a Potentially Liable Person (PLP) Determination letter to the Port as owner of the log handling site. In response, the Port entered into an Agreed Order with Ecology promising to conduct a remedial investigation of the extent of the hazardous substances and a feasibility study on the options for cleanup, as well as draft a cleanup plan. As of June 2018, the remedial investigation and feasibility studies for cleanup of the log handling facility reached their final stages. The Port has paid, and has agreed to continue to pay, for remedial action at the site.

The remediation report lists wood waste as the first contaminant of concern. In addition, substances such as metals, LPAHs,[7] HPAHs,[8] cPAHs,[9] benzoic acid, phenols, dioxins, and furans contaminate the wood debris area and commingle within the wood waste. While many of these contaminants stem from the use of machinery during the log handling operations, hazardous substances such as benzoic acid and phenols also result from the decomposition and degradation of the wood debris in the marine environment. Site testing in the log

---

diverse benthic community is a foundation of the aquatic food web and recycles nutrients between the sediment and water column in forms useable to other organisms."

[7] LPAHs are low molecular weight polycyclic aromatic hydrocarbons such as acenaphtene and flourene.

[8] HPAHs are high molecular weight polycyclic aromatic hydrocarbons such as benzo(a)pyrene, fluoranthene and chrysene.

[9] cPAHs are carcinogenic polycyclic aromatic hydrocarbons.

pocket demonstrated the presence of these contaminants as well as other known by-products of wood debris including ammonia and sulfides.

In July 2016, the Port filed a complaint seeking contribution from defendants under MTCA. The Port requested proportionate recovery of the costs of remediation for the site from these former operators.[10] The Port also sought declaratory judgment on two issues. First, the Port requested declaratory relief "that the Operator Defendants, as former owners and/or operators under RCW 70.105D.040(2), are strictly liable, jointly and severally, for all remedial actions costs resulting from releases or threatened releases of hazardous substances at the Site, a facility under RCW 70.105D.020(8)." Second, the Port claimed entitlement to declaratory judgment that defendants' insurance carrier is obligated to defend and/or indemnify the Port with respect to the environmental liability. Finally, the Port raised a breach of contract claim against the insurance company for failure to indemnify it for costs and liability incurred due to the damage caused by the hazardous substances.

Defendants jointly moved for summary judgment, requesting dismissal of all claims. Specifically, defendants sought to avoid liability on the ground that

---

[10] During oral argument, Itochu disputed its role as an operator of the log handling facility. Wash. Court of Appeals oral argument, Port of Anacortes v. Frontier Indus., No. 78726-8-I (July 12, 2019), at 2 min., 40 sec. through 3 min. 18 sec. (on file with the court). Itochu did not raise this issue in its briefing on review. We do not consider arguments made outside the briefing. RAP 10.3. For the purposes of this review, we assume Itochu operated the log handling facility as alleged.

wood debris does not constitute a hazardous substance.[11] The trial court denied the motion for summary judgment.

The trial court also denied defendants' motion for reconsideration, but certified the decision for review by this court under RAP 2.3(b)(4). A commissioner of this court accepted discretionary review to determine whether wood debris is a hazardous substance under MTCA.[12]

## II.
## DISCUSSION

Defendants contend that wood waste, as a matter of law, does not qualify as a hazardous substance under MTCA.[13] They ask us to reverse the trial court's ruling on this ground.

Appellate courts review de novo orders on motions for summary judgment and perform the same inquiry as the trial court. Owen v. Burlington N. & Santa Fe R.R., 153 Wn.2d 780, 787, 108 P.3d 1220 (2005). A court properly grants summary judgment where there exists no genuine issue as to any material fact,

---

[11] Defendants also alleged that the Port could not meet its burden of producing evidence of a release or disposal of other hazardous substances during the time defendants operated the site. This issue is not on review.

[12] After completion of the briefing, the Port filed a motion to strike portions of defendants' reply briefing concerning argument about the validity of the Sediment Management Standards (SMS) under the Administrative Procedures Act (APA). A commissioner of this court referred the motion to strike to the panel for consideration with the merits. Because we do not reach the SMS arguments raised by the Port, the motion is moot and we need not rule on it.

[13] Defendants argue the sole issue on review is whether wood debris is a hazardous substance and that we are limited to answering only this question. Specifically, defendants claim that the Port did not previously raise the issue of liability for disposal of non-hazardous materials that later decompose into hazardous substances. Defendants do not cite any legal authority to support their position. We may affirm the trial court's ruling on a summary judgment motion on any ground supported by the record. Pac. Marine Ins. Co. v. Dep't of Revenue, 181 Wn. App. 730, 737, 329 P.3d 101 (2014).

entitling the moving party to judgment as a matter of law. Owen, 153 Wn.2d at 787; CR 56(c). "The court must consider the facts in the light most favorable to the nonmoving party, and the motion should be granted only if reasonable persons could reach but one conclusion." GO2Net, Inc. v. C I Host, Inc., 115 Wn. App. 73, 83, 60 P.3d 1245 (2003). We may affirm a trial court's decision on a motion for summary judgment on any ground supported by the record. Pac. Marine Ins. Co. v. Dep't of Revenue, 181 Wn. App. 730, 737, 329 P.3d 101 (2014).

This case requires us to interpret MTCA. We review de novo questions of statutory interpretation. Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd., 182 Wn.2d 342, 350, 340 P.3d 849 (2015). Our "fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then [we] must give effect to that plain meaning as an expression of legislative intent." Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). Furthermore, "meaning is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." Campbell & Gwinn, 146 Wn.2d at 11. The court must interpret the language in a manner rendering no portion of the statute meaningless or superfluous. Rivard v. State, 168 Wn.2d 775, 783, 231 P.3d 186 (2010). The court defers to an agency's interpretation of its own regulations only if the statute presents ambiguity. Port of

Seattle v. Pollution Control Hearings Bd., 151 Wn.2d 568, 593, 90 P.3d 659 (2004).

"The primary intent of MTCA is that '[p]olluters should pay to clean up their own mess.'" Pope Res., LP v. Dep't of Nat. Res., 190 Wn.2d 744, 751, 418 P.3d 90 (2018) (quoting State of Washington Voter's Pamphlet, General Election 6 (Nov. 8, 1988)). "The provisions of [MTCA] are to be liberally construed to effectuate the policies and purposes of this act." RCW 70.105D.910.

MTCA imposes strict liability on any owner or operator of a facility "at the time of disposal or release of . . . hazardous substances" there. RCW 70.105D.040(1)(b); See Weyerhauser Co. v. Commercial Union Ins. Co., 142 Wn.2d 645, 661, 15 P.3d 115 (2000). It provides for a private right of action for contribution or declaratory relief against liable persons to recover remedial costs. RCW 70.105D.080.

MTCA defines "hazardous substances" as:

(a) Any dangerous or extremely hazardous waste as defined in RCW 70.105.010 (1) and (7), or any dangerous or extremely dangerous waste designated by rule pursuant to chapter 70.105 RCW;

(b) Any hazardous substance as defined in RCW 70.105.010(10) or any hazardous substance as defined by rule pursuant to chapter 70.105 RCW;

(c) Any substance that, on March 1, 1989, is a hazardous substance under section 101(14) of the federal cleanup law, 42 U.S.C. Sec. 9601(14);

(d) Petroleum or petroleum products; and

(e) Any substance or category of substances, including solid waste decomposition products, determined by the director by rule to

present a threat to human health or the environment if released into the environment.

RCW 70.105D.020(13).

Here, defendants argue that wood debris does not fit within the established definitions for hazardous waste. Ecology, while not a party in this case, submitted an amicus brief essentially conceding that wood debris itself does not fit into the definitions of a hazardous substance in RCW 70.105D.020(13). We agree.

However, the evidence in the record demonstrates that wood debris results in a release of listed hazardous substances as it breaks down in the marine environment. As discussed above, the wood debris decomposition products include ammonia, hydrogen sulfide, and benzoic acid. The Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) has designated these compounds as hazardous substances. 42 USC § 9601(14); 40 C.F.R. § 302.4. As hazardous substances designated under CERCLA, ammonia, hydrogen sulfide, and benzoic acid meet the definition of hazardous substances for MTCA under RCW 70.105D.020(13)(c). While wood by itself may not qualify as a hazardous substance, wood debris decomposing in the marine environment releases designated hazardous substances under MTCA.

For the question of liability, the issue then becomes when the release of the hazardous substances occurred as a result of wood debris decomposition in

the marine environment. As noted above, parties strictly liable under MTCA include, "[a]ny person who owned or operated the facility at the time of disposal or release of the hazardous substances." RCW 70.105D.040(1)(b). "'Release' means any intentional or unintentional entry of any hazardous substance into the environment, including but not limited to the abandonment or disposal of containers of hazardous substances." RCW 70.105D.020(32).

The record shows that as of July 2004, sediment samples from the log pocket included detectible levels of hazardous substances known to be released during wood decomposition in the marine environment, including ammonia, benzoic acid, and phenols. While the chemicals of concern did not exceed Ecology's Sediment Quality Standards at that time, their presence at the cessation of log handling indicates a release of hazardous substances occurred during defendants' tenure as operators of the facility.[14]

In the context of defendants' motion for summary judgment, we must view the evidence in the light most favorable to the Port. In doing so, we determine that issues of fact exist regarding whether hazardous substances were released

---

[14] Defendants point to microorganism activity as the cause of release of hazardous substances from the wood debris. But the MTCA provision here does not specify the types of actors required for liability. Liability attaches to "[a]ny person who owned or operated the facility at the time of disposal or release of the hazardous substances." RCW 70.105D.040(1)(b). Release entails "entry" of a hazardous substance into the environment regardless of intent. RCW 70.105D.020(32). MTCA does not require owner or operator activity for liability. The fact of the release, rather than the actors involved in the release, triggers liability for an owner or operator. This adheres to the strict liability scheme established by the Act.

at the time defendants were operators at the log handling facility.[15] The trial court properly denied summary judgment.

Affirmed.

_Chun, J._

WE CONCUR:

_____

_Dwyer, J._

---

[15] In light of this conclusion, we do not reach the following issues: (1) whether Ecology's SMS, promulgated through formal rulemaking, establishes wood waste as a hazardous substance, as argued by the Port, and (2) whether the disposal of a hazardous substance includes the disposal of a substance (such as wood debris) into an environment where it will cause a release of hazardous substances, as argued by Ecology.