# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| NORTHWEST ALLOYS, INC., AND MILLENNIUM BULK TERMINALS-LONGVIEW, LLC, | No. 51677-2-II |
| Respondents/Cross-Appellants, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF NATURAL RESOURCES, AND THE HONORABLE HILARY S. FRANZ, AND COLUMBIA RIVERKEEPER, WASHINGTON ENVIRONMENTAL COUNCIL, AND SIERRA CLUB, | PUBLISHED OPINION |
| Appellants/Cross-Respondents. | |

SUTTON, J. — The Department of Natural Resources and the Commissioner of Public Lands Hilary S. Franz (collectively DNR), and Columbia Riverkeeper, Washington Environmental Council, and Sierra Club (collectively Intervenors) appeal the superior court's order concluding that DNR acted arbitrarily and capriciously by denying Northwest Alloys, Inc.'s (NWA) consent to sublease state-owned aquatic lands to Millennium Bulk Terminals-Longview, LLC (Millennium). DNR and Intervenors argue that DNR's decision to deny consent to sublease was not arbitrary and capricious due to NWA's refusal to provide requested financial information about Millennium and DNR's legitimate concerns about Millennium's financial condition and business reputation.

NWA and Millennium cross-appeal and argue that the superior court applied the incorrect standard of review. NWA and Millennium contend that under RCW 79.02.030, the superior court should review de novo DNR's denial of consent to sublease by applying the "reasonably prudent person" test.

We agree with DNR and Intervenors, and reverse and vacate the superior court's orders, and order the superior court to issue a new order affirming DNR's denial.[1]

FACTS

I. HISTORY OF THE SITE

Reynolds Metals Company, which was owned by Alcoa Corporation, owned property adjacent to the Columbia River navigation channel in Longview. In 2004, Chinook Ventures, Inc. purchased a smelter located on the property and entered into a long-term ground lease with Reynolds. In 2005, Alcoa transferred the property from Reynolds to another of its subsidiaries, NWA.

Alcoa—most recently through NWA—leased the state-owned aquatic lands adjacent to the property from DNR. NWA used the dock and associated infrastructure on the aquatic lands for shipping alumina to Alcoa's Wenatchee Works smelter in eastern Washington.

In 2008, DNR renewed its aquatic lands lease with NWA for an additional 30-year term. Under the terms of the lease, NWA could not sublease the property without the written consent of DNR, which DNR could not unreasonably withhold. The lease provided that in considering

---

[1] NWA and Millennium also cross-appeal the superior court's remedy order, which remanded the sublease decision back to DNR for further consideration. Because we reverse the superior court's order on the merits, we do not address the superior court's remedy order other than to vacate it.

whether to consent to a sublease, DNR could consider, among other items, "the proposed transferee's financial condition, business reputation and experience, the nature of the proposed transferee's business, the then-current value of the [p]roperty, and such other factors as may reasonably bear upon the suitability of the transferee as a tenant of the [p]roperty." Clerk's Papers (CP) 16890.

After renewing its lease with DNR, NWA subleased the aquatic lands to Chinook with DNR's consent. Chinook imported alumina as an operator for NWA, and also used the property to store petroleum coke and transfer it onto ships at the dock. During its subtenancy, Chinook failed to obtain the required state and local regulatory permits for its petroleum coke business and failed to provide adequate environmental controls. Chinook built improvements such as a remodeled ship loader and overwater conveyor system without obtaining the required permits or authorization under the lease. Chinook amassed a significant number of environmental violations issued by the Department of Ecology, received a stop work order from Cowlitz County, received a notice of violation from the U.S. Army Corps of Engineers, exacerbated environmental concerns at the site, and put NWA in default of its lease with DNR.

## II. MILLENNIUM

In the fall of 2010, while still in default of the lease, NWA sought DNR's consent to sublease the property to Millennium. Millennium was a limited liability company organized in 2010 for the purpose of acquiring Chinook's assets, leasing the smelter property, and subleasing the aquatic lands. Millennium's purported plan was to continue the alumina handling operations at the site using the existing equipment and planned upgrades. Millennium's undisclosed long-term objective, however, was to construct a large coal export terminal on the site.

3

According to the original permit application from Millennium's corporate parent, a subsidiary of Ambre Energy Inc. (Ambre), the terminal project would allow coal handling and exportation of 5.2 million metric tons of coal per year. A State Environmental Policy Act (SEPA)[2] determination for the original permit application resulted in a mitigated determination of nonsignificance finding, meaning that a full environmental impact study was not required. However, internal Ambre documents later revealed that Millennium intentionally concealed the extent of its plans for the coal export facility in order to avoid full environmental review. After Millennium's deception made national and local news, Millennium withdrew its terminal proposal.

In early 2012, Millennium filed a revised permit application, this time disclosing the full scope of its plans for facilities on the property. Millennium sought to build, operate, and maintain the largest coal export terminal on the west coast, exporting 44 million metric tons of coal per year. Millennium planned to add two large docks to the property. Operating the docks would have required significant new dredging of the aquatic lands within and outside of the geographical areas covered by the lease.

III. Financial Concerns

During a severe coal market downturn in late 2014, Ambre sold its North American assets—including a 62 percent ownership stake in Millennium—to a creditor, Lighthouse Resources.

_____

[2] Ch. 43.21C RCW.

4

In late 2015, Alcoa announced it would curtail production at Wenatchee Works. Wenatchee Works had used the Longview dock leased by NWA to import alumina. Following the suspension of production at Wenatchee Works, the dock was not in use.

Due to continued poor coal market conditions, several United States coal producers filed for bankruptcy in 2016. Arch Coal, Inc., which owned 38 percent of Millennium, declared bankruptcy in early 2016. As part of its bankruptcy, Arch Coal sold its interest in Millennium to Lighthouse Resources, Millennium's only remaining corporate parent. In return for its interest in Millennium, Arch Coal received only a release of its obligation to provide capital support of Millennium's projects. Arch Coal stated that the capital contributions Millennium needed from Arch Coal to stay afloat were so significant that Arch Coal's entire ownership share in Millennium, which it valued at nearly $38 million, would have been completely drawn down in a matter of weeks.

## IV. NEGOTIATIONS & DNR'S REQUESTS FOR INFORMATION

On November 18, 2010, shortly after NWA sought DNR's consent to sublease to Millennium, DNR requested information about Millennium from NWA, including at a minimum:

1. The financial condition of Millennium Bulk Logistics, Inc., including the extent of its assets, to help DNR determine whether it has the financial wherewithal to comply with the terms of the lease—especially in terms of abiding by requirements related to authorized improvements.

2. The business reputation and experience of Millennium Bulk Logistics, Inc., and if this Incorporation has been formed just to operate this site, the business reputation of any of its affiliates, owners, or partners. DNR would like to understand the history of this company and any of its individual owners in terms of the conduct of their business(es) and whether they have any history of causing environmental damage or failing to comply with applicable law and regulatory requirements. As a steward of state-owned aquatic lands and responsible for this site, DNR would like to understand that the new proposed sublessee will be able to perform its

obligations under the lease that relate to site stewardship and otherwise. Please inform us of each of the owners of the Incorporation and their experience with site uses such as the one proposed for the sublease.

3. Any information that you can provide that will inform us of site operating protocols that will protect state-owned aquatic lands from the release of hazardous substances and that will provide environmental protection. If Millennium or any of its partners has experience with the types of systems that would be put in use at the Longview site, please describe what controls are in place to prevent harm to the aquatic environment in which the facility would exist, and how upland operations may affect state-owned aquatic lands.

CP at 17023.

Four days later, Millennium responded to DNR and explained that Millennium was a LLC organized for the sole purpose of the Longview site project and was a wholly owned subsidiary of Ambre. Millennium directed DNR to Ambre's website to review Ambre's annual reports and noted that, at closing, Millennium planned to post a $10 million irrevocable standby letter of credit to NWA to provide security for Millennium's lease commitments. Millennium also provided a follow-up letter summarizing the assets devoted to the project.

On November 29, 2010, DNR clarified that the information Millennium had provided did not fully satisfy DNR's requests. Millennium resisted DNR's requests, stating that "the thought that Millennium has to demonstrate financial capability to DNR is misplaced. Certainly, DNR can make reasonable inquiry into the sublease and its plans. However, the obligations of Millennium flow to Northwest Alloys, Inc., the tenant." CP at 337.

After Millennium's full plan for the coal terminal came to light in early 2011, DNR informed Millennium and NWA that it would not make a decision on the request for consent to sublease until the related shoreline permit and SEPA processes were resolved and until the companies obtained the permits required for any and all planned improvements. DNR explained

6

that NWA's and Millennium's inconsistencies regarding the scope of the proposed coal project made evaluating the proposed sublease difficult.

By late 2015, DNR's, NWA's, and Millennium's negotiations appeared to be in their final stages. On December 14, 2015, DNR suggested two revisions to the consent to sublease, which NWA and Millennium accepted. NWA and Millennium replied, "From our standpoint, we believe these document[s] now to be final, and that all we need to do is 'accept' the changes in both and route for signature." CP at 1512.

However, after Arch Coal's bankruptcy in January, DNR sent a letter dated February 3, 2016, to NWA explaining that DNR needed additional information to complete its review of the request for consent to sublease. DNR emphasized its concern about Arch Coal's bankruptcy and the potential impact on Millennium's financial capability.

> The financial capability of Millennium to perform is critical. As the conditions on the leased property and adjoining uplands resulting from the operations of [NWA's] previous subtenant Chinook Ventures demonstrate, when a subtenant in possession of the property lacks the wherewithal to maintain the property and comply with other lease requirements, it may cause significant damage to the property and improvements that takes substantial amounts of time and resources to address.

CP at 1539.

DNR also questioned Alcoa's recent decision to shutter the Wenatchee Works operation and how that would impact NWA's and Millennium's plans for using the Longview property. DNR requested that NWA provide audited financial statements from Millennium, all documents related to Millennium filed in Arch Coal's bankruptcy case, a statement indicating whether Arch Coal would make any disclosures in its bankruptcy proceeding related to the sublease between NWA and Millennium, and a statement from Millennium regarding its plans for using the existing

dock on the property. Millennium responded that the financial statements DNR sought were confidential.

After the bankruptcy court approved the sale of Arch Coal's ownership interest in Millennium in June 2016, DNR sent another letter to Alcoa, expressing concerns about Millennium's obligations to NWA. DNR noted that as a result of Arch Coal's sale, Lighthouse Resources had become the sole owner of Millennium. DNR explained, "Given the difficult market conditions in the coal industry and the fact that [Lighthouse Resources] now has the sole financial responsibility for Millennium, DNR seeks assurance that Millennium has the financial capability to meet its significant ongoing financial obligations and comply with the requirements of [NWA's] lease with DNR." CP at 1741.

> To assist its evaluation of Millennium's financial condition, DNR requested:
>
> A balance sheet, income statement, and cash flow statement, prepared in accordance with GAAP Accounting Standards[] that accurately states the current assets, liabilities, and capital of [Millennium] and its income and cash flow for the year ending June 30, 2016.
>
> A copy of the January 1, 2011 Lease between [NWA] and [Millennium] for the uplands adjacent to [NWA] leasehold under its lease with DNR and the June 5, 2104 amendment to the lease.
>
> A copy of Millennium's business plan for the existing dock on [NWA's] leasehold that identifies the income that Millennium expects to receive from operations on the existing dock and the sources of income.
>
> Any additional information which [NWA] can provide to shed light on the financial condition of Millennium.

CP at 1742. NWA did not respond to this request.

V.  INVOLVEMENT OF ENVIRONMENTAL GROUPS

A group of environmental non-profit organizations contacted state and county regulatory agencies including DNR in October 2010, expressing their concerns about the development of a large coal terminal on the aquatic lands.  The groups reiterated their concerns to DNR in November 2010, and requested a meeting with the Commissioner of Public Lands.

On March 16, 2011, the environmental groups sent a letter to the Commissioner regarding Millennium's business reputation based on Millennium's strategy to conceal their long-term plans for the property in an attempt to evade SEPA review.  The groups attached several documents that they had obtained regarding Millennium.  The letter urged DNR to consider Millennium's deceitful practices when evaluating Millennium's business reputation under the terms of the lease.

On January 25, 2016, as DNR, NWA, and Millennium were finalizing the documents for DNR's consent to sublease the aquatic lands, the environmental groups sent DNR a memo "to lay out some of the facts and legal considerations attendant to DNR's pending decision."  CP at 1532.  The memo urged DNR to deny consent to sublease based on Millennium's weak financial condition, the international coal market's dismal economics, and Millennium and its parent company's poor business reputation and lack of experience managing a coal terminal.

VI.  DNR DENIES CONSENT TO SUBLEASE

On January 5, 2017, the Commissioner of Public Lands issued a letter denying DNR's consent to sublease the aquatic lands to Millennium.  The letter explained, "DNR's decision is based on Northwest Alloys' failure to provide requested information regarding the financial condition and business of Millennium as well as other factors that bear on the suitability of Millennium as a subtenant."  CP at 16855.  The denial letter highlighted DNR's concern about

Millennium's financial condition given the bankruptcy of Arch Coal, Wenatchee Works' indefinite closure, coal's historically poor market conditions, and Millennium's commitments to NWA under the ground lease.

The denial letter noted, "As the steward of Washington's state-owned aquatic lands, the financial capacity of a subtenant to perform is important to DNR." CP at 16856. Referencing Chinook's damage to the property during its subtenancy, the letter explained, "The recent history under the lease supports the need for careful examination of the capacity of subtenants at the site to comply with lease obligations." CP at 16856.

The denial letter also referenced Millennium's "significant error" in failing to disclose in its original permit application its plans to significantly increase the amount of coal shipped from the facility. CP at 16857. "That Millennium does not have a lengthy track record on which to judge performance and in its short history has made a significant error with respect to its planned activities on the leased property supports the need for a thorough review of Millennium's potential suitability as a subtenant, including its financial condition." CP at 16857.

The denial letter concluded:

> [NWA] has failed to provide information reasonably requested by DNR as permitted under the lease for review of [NWA's] request for consent to sublease. As detailed above, DNR's requests for information are supported by the bankruptcy of Arch Coal; Millennium's commitments to [NWA]; market conditions facing Millennium's sole remaining owner, [Lighthouse Resources]; the history of subleasing under the lease; and the absence of a significant track record supporting Millennium. Accordingly, [NWA's] request for consent to sublease has been denied.

CP at 16857.

10

VII. SUPERIOR COURT PROCEEDINGS

NWA and Millennium appealed the Commissioner's letter denying DNR's consent to sublease to the superior court under RCW 79.02.030. The superior court granted Columbia Riverkeeper, Washington Environmental Council, and Sierra Club's motion to intervene.

After extensive briefing and argument, the superior court entered an order on the merits of whether DNR's decision to deny consent to sublease was unreasonable. The superior court concluded that in considering the request to sublease, DNR was performing an administrative proprietary function, not a quasi-judicial function. Accordingly, the superior court concluded that the proper standard of review in the matter was whether DNR's actions were arbitrary, capricious, or contrary to law.

Addressing the reasonableness of DNR's decision, the superior court concluded that it must consider the unique statutory mandates that apply to DNR and evaluate DNR's denial from the standpoint of a reasonable landlord in DNR's position. The superior court concluded that DNR's reasons for denying consent to sublease were not supported by facts and that DNR's denial was arbitrary and capricious. As a remedy, the superior court ordered DNR to "undertake further consideration" of NWA's request for consent to sublease to Millennium. CP at 17815.

DNR and Intervenors appeal and NWA and Millennium cross-appeal the superior court's orders.

ANALYSIS

I. STANDARD OF REVIEW

The parties disagree as to our standard of review. DNR and Intervenors contend that we sit in the same position as the trial court and conduct a de novo review of the agency record to

11

determine whether DNR's consent to sublease was unreasonable. NWA and Millennium argue that we should review the superior court's findings for substantial evidence and determine de novo whether the superior court's conclusions flow from those findings. We agree with DNR and Intervenors.

RCW 79.02.030 states:

> Any applicant to purchase, or lease, any public lands of the state . . . and any person whose property rights or interests will be affected by such sale or lease, feeling aggrieved by any order or decision of the . . . commissioner, concerning the same, may appeal therefrom to the superior court of the county in which such lands or materials are situated . . . . The hearing and trial of said appeal in the superior court shall be de novo before the court, without a jury, upon the pleadings and papers so certified . . . . Any party feeling aggrieved by the judgment of the superior court may seek appellate review as in other civil cases.

"Where the record at trial consists entirely of written documents and the trial court therefore was not required to 'assess the credibility or competency of witnesses, and to weigh the evidence, nor reconcile conflicting evidence,' the appellate court reviews de novo." *Dolan v. King County*, 172 Wn.2d 299, 310, 258 P.3d 20 (2011) (internal quotation marks omitted) (quoting *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 252, 884 P.2d 592 (1994)). "Appellate courts give deference to trial courts on a sliding scale based on how much assessment of credibility is required; the less the outcome depends on credibility, the less deference is given to the trial court." *Dolan*, 172 Wn.2d at 311. But substantial evidence may be the more appropriate standard in cases where the superior court reviewed "an enormous amount of documentary evidence, weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies, and issued statutorily mandated written findings." *Dolan*, 172 Wn.2d at 311.

Here, although the superior court reviewed a large agency record, it did not weigh evidence or resolve evidentiary conflicts. Nor was the superior court statutorily required to enter written findings of fact. Under RCW 79.02.030, the superior court defers to the factual findings of the commissioner and limits its review to the application of law to the admitted facts. *Polson Logging Co. v. Martin*, 195 Wash. 179, 184-85, 80 P.2d 767 (1938); *see also State v. Forrest*, 13 Wash. 268, 270-71, 43 P. 51 (1895).[3] Given that the superior court made no factual findings, leaving only its conclusions of law for our review, we hold that we review DNR's decision to deny consent to sublease de novo.[4]

---

[3] These cases rely on an early statute—Rem. Rev. Stat. §§ 7797-1 to 7797-201—which later became RCW 79.02. This does not change our analysis.

[4] NWA and Millennium argue that we should interpret RCW 79.02.030's use of the phrase "as in other civil cases" to mean that we review the superior court's findings for substantial evidence. NWA and Millennium argue that RCW 79.02.030's use of the phrase "as in other civil cases" should have the same meaning as in RCW 51.52.140, which has been interpreted as providing for substantial evidence review. *See Hendrickson v. Dep't of Labor & Indus.*, 2 Wn. App. 2d 343, 351, 409 P.3d 1162, *review denied*, 190 Wn.2d 1030 (2018). However, NWA and Millennium overstress the similarity of that particular phrase while ignoring key differences in the statutory schemes.

In industrial insurance appeals, the superior court or a jury may substitute its own findings and decision for the Board of Industrial Insurance Appeals if, after weighing the evidence, it finds by a preponderance of the evidence that the Board's findings and decision are incorrect. *Harrison Mem'l Hosp. v. Gagnon*, 110 Wn. App. 475, 482, 40 P.3d 1221 (2002). Accordingly, in industrial insurance appeals, we review the superior court's decision for substantial evidence. *Rogers v. Dep't of Labor & Indus.*, 151 Wn. App. 174, 180, 210 P.3d 355 (2009). In contrast, in appeals arising pursuant to RCW 79.02.030, as here, the superior court is *not* entitled to weigh evidence and must defer to the commissioner's factual findings. We disagree that RCW 79.02.030 is analogous to RCW 51.52.140.

## II. DNR'S DENIAL OF CONSENT

### A. ADMINISTRATIVE DECISION

The parties also disagree as to the degree of deference owed to DNR's decision denying consent to sublease. DNR argues that its decision was administrative and should be reviewed under an arbitrary and capricious standard. NWA and Millennium argue that DNR was not acting in an administrative capacity but instead made a quasi-judicial determination, and therefore, its decision should be reviewed de novo applying a "reasonably prudent person" test. We agree with DNR.

Although RCW 79.02.030 uses the language "de novo" review, such a review of an administrative agency's decision "is only permissible when the agency acts in a quasi-judicial manner." *Yaw v. Walla Walla School Dist. No. 140*, 106 Wn.2d 408, 413, 722 P.2d 803 (1986). In cases in which the agency acted in its administrative function, review is limited to whether the agency acted arbitrarily, capriciously, or contrary to law. *Yaw*, 106 Wn.2d at 413. "Allowing only limited appellate review over administrative decisions, rather than original or appellate jurisdiction as a matter of right, 'serves an important policy purpose in protecting the integrity of administrative decision-making.'" *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 295, 197 P.3d 1153 (2008) (quoting *King County v. Wash. State Boundary Review Bd. for King County*, 122 Wn.2d 648, 668, 860 P.2d 1024 (1993).

In *Francisco v. Bd. of Directors*, our Supreme Court identified four steps to determine if an agency's action was administrative or quasi-judicial. 85 Wn.2d 575, 579, 537 P.2d 789 (1975). They are whether (1) the court could have been charged in the first instance with the responsibility of making the decision; (2) the function of the agency is one that courts have historically

performed; (3) the agency performs functions of inquiry, investigation, declaration and enforcement of liabilities as they stand on present or past facts under existing laws; and (4) the agency's action is comparable to the ordinary business of courts. *Francisco*, 85 Wn.2d at 579.

Here, DNR acted in its administrative capacity when it decided whether to grant or deny consent to sublease. DNR holds state-owned aquatic lands in trust for the public by virtue of the Washington Constitution. *Pope Res. v. Dep't of Natural Res.*, 190 Wn.2d 744, 754, 418 P.3d 90 (2018). The public trust doctrine is rooted in article XVII, section 1 of the Washington Constitution[5] and protects "'public ownership interests in certain uses of navigable waters and underlying lands, including navigation, commerce, fisheries, recreation, and environmental quality.'" *Weden v. San Juan County*, 135 Wn.2d 678, 698, 958 P.2d 273 (1998 (quoting Ralph W. Johnson et al., *The Public Trust Doctrine and Coastal Zone Management in Washington State,* 67 Wash. L. Rev. 521, 524 (1992).

Through the aquatic lands statutes, the State granted sovereign powers to DNR for protection of the State's interest in the trust. *Pope*, 190 Wn.2d at 755. As such, DNR is vested with the discretionary, administrative responsibility to reject a bid to lease state lands as the interests of the State or affected trust require. *See* RCW 79.105.020; RCW 79.02.280.

---

[5] Article XVII, section 1 states "The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes."

NWA and Millennium argue that "[w]hen acting pursuant to a contract, an agency is exercising an essentially judicial function."[6] Response to Appellants' Opening Br. (Response Br.) at 43. NWA and Millennium contend this is so because "[c]ontracts fix the parties' obligations to one another and eliminate the discretion inherent when an agency is exercising its regulatory authority." Response Br. at 44. It is undisputed that DNR is beholden to the terms of its lease with NWA and that, pursuant to the lease, DNR could not unreasonably withhold its consent. However, DNR cannot contract itself out of its statutorily mandated duty to exercise discretion in furtherance of the public trust.

Nothing in the lease purports to extinguish DNR's statutory authority to exercise its discretion to approve a sublease, so long as it does not unreasonably withhold consent. Indeed, RCW 79.105.210(4) states, "The power to lease state-owned aquatic lands is vested in the department, which has the authority to make leases upon terms, conditions, and length of time *in conformance with* the state Constitution and chapters 79.105 through 79.140 RCW." (Emphasis added).

It follows that the courts could not constitutionally make a sublease determination in the first instance. Nor have courts historically managed aquatic lands held in public trust because that is a function DNR performs. Here, DNR carefully reviewed NWA's request for consent to sublease and Millennium's suitability as a potential sublessee for the sensitive property. Determining whether Millennium had the financial soundness, environmental awareness, and

---

[6] NWA cites *Yaw*, 106 Wn.2d 408 in support of its argument. However, NWA overstates the holding in *Yaw*. The *Yaw* opinion did not hold that all agency decisions involving a contract are necessarily judicial actions. *Yaw* specifically dealt with a school board's hiring decision in light of a collective bargaining agreement.

business reputation to meet the obligations of the lease of state-owned aquatic lands held in public trust was a uniquely administrative decision left to DNR by virtue of the Washington State Constitution and the aquatic lands statutes. *See Malmo v. Case*, 28 Wn.2d 828, 836, 184 P.2d 40 (1947) (holding that the Commissioner of Public Land's decision refusing to grant extensions for contracts involving timber cutting was not arbitrary or capricious); *see also State ex rel. Thompson v. Babcock*, 147 Mont. 46, 51, 409 P.2d 808 (1966) (noting, under similar Montana law, that "[t]here is no doubt that the State Board of Land Commissioners has considerable discretionary power when dealing with the disposition of an interest in land they hold in trust for the people of this state").

Accordingly, we hold that DNR's decision to deny consent to sublease was an administrative decision. We apply a de novo review of the agency record to determine if DNR's decision to deny consent to sublease was arbitrary and capricious.

B.  DENIAL NOT ARBITRARY AND CAPRICIOUS

Applying a de novo review of the agency record, we hold that DNR's decision to deny consent to sublease was not arbitrary and capricious.

Agency action is arbitrary and capricious if it is willful, unreasoned, and taken without regard to the attending facts or circumstances. Where there is room for two opinions, agency action taken after due consideration is not arbitrary and capricious even if a reviewing court may believe it to be erroneous. *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997). Deference will be given to the specialized knowledge and expertise of the administrative agency. *Schuh v. Dep't of Ecology*, 100 Wn.2d 180, 187, 667 P.2d 64 (1983). The party who challenges

an agency action under this standard carries a heavy burden. *Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983).

Section 9 of the lease conditions NWA's subletting of the aquatic lands on DNR's written approval. That approval cannot be unreasonably withheld. The lease expressly authorizes DNR to consider, among other things, "the proposed transferee's financial condition, business reputation and experience, the nature of the proposed transferee's business, the then-current value of the [p]roperty, and such other factors as may reasonably bear upon the suitability of the transferee as a tenant of the [p]roperty." CP at 16890. Because DNR reasonably considered the factors identified in the lease in light of attending facts and circumstances, its decision was not arbitrary and capricious.

DNR's careful consideration of Millennium's financial condition and business reputation was especially reasonable given the circumstances surrounding the potential sublease. At the time DNR made its decision, coal market conditions were not promising, with U.S. coal production dropping. DNR had concerns because of the recent shuttering of Wenatchee Works, the primary importer of the alumina unloaded at the dock leased by NWA. Finally, additional financial concerns existed after Millennium's corporate parent, Ambre Energy, sold its interest in Millennium, and Millennium's other corporate parent, Arch Coal, filed bankruptcy.

DNR was also acutely aware of the damage a negligent subtenant could inflict on the sensitive aquatic lands, given its recent negative experience with NWA's prior subtenant, Chinook. Millennium had intentionally misrepresented the scope of its plans for the property in 2011. Millennium sought to build, operate, and maintain the largest coal export terminal on the west coast. Such a project posed significant financial demands and high environmental risks if

Millennium followed in the previous subtenant's footsteps with lax oversight from NWA. Accordingly, DNR had significant, well founded reasons for carefully considering the financial condition and business reputation of Millennium before consenting to sublease.[7]

NWA and Millennium do not dispute that a landlord has an interest in a subtenant's financial condition. However, NWA and Millennium make several arguments in support of their position that DNR's denial of consent was unreasonable. First, they argue that because NWA would remain liable under the lease for any default by Millennium, DNR was necessarily unreasonable in denying consent. We reject this argument.

Section 9.1 of the lease expressly authorizes DNR to consider a potential subtenant's financial consideration in determining whether to grant consent. Accepting NWA's argument would mean rendering section 9.1 meaningless. And we must construe contract language in a manner that gives effect to the words used and does not render the chosen language meaningless. *MacLean Townhomes, LLC v. Am. 1st Roofing & Builders, Inc.*, 133 Wn. App. 828, 831, 138 P.3d 155 (2006). Under NWA's argument, DNR's right to grant or deny consent to sublease would be reduced to mere ritual because under section 9.1(c) of the lease NWA would always remain liable under the lease in the event of a default by a subtenant.

--------

[7] Even if we applied the "reasonably prudent person" test, we would conclude that DNR's decision to deny consent to sublease was not unreasonable. In Washington, a lease term that prohibits a landlord from "unreasonably" withholding consent requires a reviewing court to determine "whether a reasonably prudent person in the landlord's position would have refused consent." *Ernst Home Ctr., Inc. v. Sato*, 80 Wn. App. 473, 486, 910 P.2d 486 (1996); *see also 224 Westlake, LLC v. Engstrom Props., LLC*, 169 Wn. App. 700, 721, 281 P.3d 693 (2012). Our analysis above also would apply under this test. It was not unreasonable for DNR to withhold consent when NWA refused to provide requested financial information, especially in light of DNR's legal responsibilities as manager of state-owned aquatic lands held in public trust.

The fact that the tenant remains liable under the lease is less significant where, as here, a subtenant's actions have the potential to significantly impact sensitive public lands. As seen in the situation with Chinook, the fact that NWA would remain liable for Millennium's default under the lease does not remove the risk of long-term damage to a sensitive public resource, which DNR has been charged with managing in the public trust. NWA's liability under the lease would not prevent such damage.

Second, NWA and Millennium argue that DNR's denial of consent was unreasonable because the financial documents DNR requested were irrelevant. NWA and Millennium explain that Millennium's financial statements would "only have shown what DNR already knew," namely that Millennium had no positive revenues to cover its operating expenses and that it relied on regular infusions of cash from its parent company. Response Br. at 28, 31. NWA and Millennium further argue that the ground lease between NWA and Millennium had no relevancy to DNR because DNR was not a party to that lease and Millennium's obligations to NWA were otherwise secured by a $10 million letter of credit.

But as noted above, the lease expressly stated that in considering whether to grant consent to sublease, DNR could consider "the proposed transferee's financial condition" as well as "such other factors as may reasonably bear upon the suitability of the transferee as a tenant of the [p]roperty." CP at 16890. Therefore, the lease language supported DNR's requests for information.

In addition, the fact that Millennium's financial statements would have confirmed DNR's suspicions that Millennium's financial condition remained precarious does not render the financial statements irrelevant. Millennium's financial statements would have shown Millennium's assets,

liabilities, income, and cash flow, all of which were relevant, critical considerations in assessing Millennium's financial condition. Even if Millennium relied entirely on its parent company for operating income, the financial statements would have shown DNR how much the parent company was regularly investing and how Millennium used those investments. This information was especially relevant given the disclosures in Arch Coal's bankruptcy proceedings that its entire ownership share in Millennium, which it valued at nearly $38 million at the time of bankruptcy, would be eliminated within a matter of weeks.

Third, NWA and Millennium argue that, given what DNR already knew about Millennium, DNR should have requested information on Millennium's parent company's financial condition. But because Millennium's parent company would have no legal obligation to DNR, its financial condition was of little value in alleviating DNR's concerns about Millennium's ability to manage its obligations, particularly in light of the recent restructuring of its corporate ownership following Arch Coal's bankruptcy and Ambre Energy's sale of its ownership stake. And DNR's requests for information from Millennium were not so narrow as to preclude Millennium from providing financial information it believed would be helpful to DNR in understanding Millennium's financial condition. Millennium knew what DNR's concerns were; Millennium could have provided its parent company's information if it believed it would be helpful in answering DNR's inquiry. Instead, NWA refused to respond at all.

Fourth, NWA and Millennium suggest that DNR acted arbitrarily and capriciously by considering Millennium's earlier failure to disclose its long-term plans for the coal terminal in determining whether to consent to sublease. They argue that DNR's willingness to negotiate a nearly-finalized sublease agreement with Millennium in 2015 undercuts DNR's contention that

21

Millennium's failure to fully disclose its plans for the property was a contributing factor to its ultimate decision to deny consent. But the lease expressly authorized DNR to consider Millennium's business reputation in considering whether to grant consent to sublease.

Further, DNR's decision to not reject all consideration of a sublease agreement with Millennium after Millennium's deception came to light in 2011 did not prohibit DNR from weighing that deception as it evaluated Millennium's business reputation. Millennium's history remained part of the context in which DNR ultimately determined whether Millennium would be a suitable subtenant for the aquatic lands. Thus, considering Millennium's business reputation, as expressly permitted by the lease, was not arbitrary and capricious.

In conclusion, DNR's consideration of Millennium's financial condition and business reputation was expressly authorized under the lease. And the additional information DNR sought from Millennium, which Millennium failed to provide, was relevant to DNR's inquiry. Accordingly, we conclude that DNR's denial of consent to sublease was not arbitrary and capricious.

No. 51677-2-II

CONCLUSION

We reverse the superior court's order concluding that DNR acted arbitrarily and capriciously by denying NWA consent to sublease state-owned aquatic lands to Millennium, and we vacate the superior court's remedy order, and order the superior court to issue a new order affirming DNR's denial.

SUTTON, J.

We concur:

MAXA, C.J.

MELNICK, J.