# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| COOKE AQUACULTURE PACIFIC, LLC, | No. 54564-1-II |
| Appellant, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES, and HILARY FRANZ, the Washington Commissioner of Public Lands, | UNPUBLISHED OPINION |
| Respondent. | |

VELJACIC, J. — Cooke Pacific, LLC (Cooke) appeals the superior court's order affirming the Department of Natural Resources' (DNR)[1] termination of Cooke's lease. The Commissioner of DNR, Hillary Franz, terminated the lease based on Cooke's default of its lease obligations. Cooke asserts the superior court erred by applying the arbitrary and capricious standard of review, rather than the de novo standard of review, to DNR's decision to terminate the lease. It also asserts the court erred by affirming the termination decision because a de novo review shows that the termination was unlawful. Alternatively, Cooke asserts the court erred in finding that DNR's decision was not arbitrary and capricious.

We hold that the superior court properly applied the arbitrary and capricious standard of review because DNR's decision to terminate the lease was administrative, and that DNR's decision

---

[1] The respondents are the Commissioner of Public Lands, Hillary Franz (in her official capacity), and the Washington State DNR. Because Cooke's allegations relate primarily to DNR's decision regarding its lease, we refer to respondents collectively as "DNR" except where indicated otherwise.

to terminate the lease was not arbitrary and capricious. Accordingly, we affirm the superior court's final order upholding DNR's lease termination decision.

FACTS

I. BACKGROUND

Since 1984, several private companies have successively leased aquatic lands in Port Angeles harbor from DNR for finfish aquaculture, which involved the use of floating net pen structures. Cooke's Port Angeles fish farm is used "for the net pen farming of Atlantic Salmon . . . . This includes stocking, husbandry, harvesting, and other activities related to and in support of this activity." Administrative Record (AR) at 2447. The facility has two floating net pen structures within the leasehold area. Cooke uses ancillary equipment within the lease area, to include a floating wooden support raft, a feeding machine, generators, pumps, pressure washers, and air compressors. The cage system is moored in place with 38 Danforth-style anchors, chains, and lines. Tractor tires are used as fenders on the steel structure and come in contact with the water. The facility also has a staff building located on the larger net pen structure.

In 2014, the United States Navy proposed constructing a pier and support facilities adjacent to the Port Angeles net pen leasehold. While discussing its project with DNR, the Navy told DNR that some of Cooke's anchor and anchor lines were located outside of Cooke's leasehold area. Cooke denied that any of its anchors were outside of the leasehold area.

II. 2015 LEASE

Cooke applied to DNR to renew its lease at the Port Angeles location. Ultimately, the parties signed the lease, and it became effective on October 1, 2015. It was set to expire on September 30, 2025.

A.      Timely Rent

Section 4.1(a) of the lease provided that Cooke must pay DNR rent annually, with rent due on or before the commencement date (October 1).  Historically, Cooke had failed to timely pay its rent on several occasions.

B.      Good Condition and Required Improvements

Section 11.2(a) required Cooke to keep the property and improvements "in good order and repair, in a clean, attractive, and safe condition."  AR at 2437.

Cooke was also required under the lease to make certain improvements to the property.  Section 7.1(a) of the lease defines "improvements" as "additions within, upon, or attached to the land," including "fill, structures, bulkheads, docks, pilings, or other fixtures."  AR at 2421.  Section 7.2 defines "existing improvements" as including "thirty-eight (38) Danforth-style anchors."  AR at 2421.

Exhibit B to the lease provided that Cooke was also required to "replace existing unencapsulated floatation materials with encapsulated floatation materials" by December 1, 2016.  AR at 2447.  This referred to certain floating Styrofoam near a wooden float on the leasehold.  Cooke was also required to ensure that all improvements, defined to include the anchors, were located entirely on the property within the leasehold by October 1, 2016.  As noted above, DNR had been informed that Cooke placed anchors outside its leasehold.[2]

---

[2] During lease negotiations, DNR staff wrote an internal memorandum requesting to enter into the new lease and described the issues, including issues with some of the anchoring system being located outside the lease area that Cooke was aware of.  The memo stated, in relevant part:

> Additional obligations were added to Exhibit B.  They pertain to . . . ensuring that all improvements are located on the Property.  The improvements in question are anchoring systems that may be outside of the current lease area.

AR at 498.

### C.     Leasehold Boundaries

Relatedly, under section 1.2(a) of the lease, Exhibit A provided a legal description of the property, which Cooke warranted was a true and accurate description of the lease boundaries:

> (a) State leases to [Cooke] and [Cooke] leases from State the real property described in Exhibit A together with all the rights of State, if any, to improvements on and easements benefiting the Property, but subject to the exceptions and restrictions set forth in this Lease (collectively the "Property").

AR at 2416.

### D.     Default and Event of Default

Section 14.1 of the lease defines "default" to include (1) the failure to pay rent when due and (2) the failure to comply with any other provision of the lease.

The lease also provided remedies in the event that a party breached provisions in the lease. Section 14.2(c) defines an "Event of Default":

> State may elect to deem a default by Tenant as an Event of Default if the default occurs within six (6) months after a default by Tenant for which State has provided notice and opportunity to cure and regardless of whether the first and subsequent defaults are of the same nature.

AR at 2439. If an event of default occurred, DNR had the remedies listed in section 14.3, which included the option to terminate the lease.

## III.     COMPLIANCE, DNR'S INVESTIGATION, AND DNR'S TERMINATION OF THE LEASE

### A.     Confirmation of Compliance

On February 10, 2017, DNR asked Cooke to confirm that Cooke was in compliance with the lease provisions. In particular, DNR inquired whether Cooke was in compliance with the requirement that Cooke replace the unencapsulated flotation materials and ensure that all improvements, which includes anchors, were located within the leasehold. Cooke responded three days later and confirmed that it was in compliance. Cooke stated, "all the tires have been removed

4

along with the wooden dock.  The repairs were made to the concrete barge that sealed up the broken areas and exposed Styrofoam.  And all the improvements are located within the property." AR at 1468.

B.      Cypress Island Collapse and Failure to Timely Pay Rent

In August 2017, a net pen at Cooke's Cypress Island commercial fish farm suffered a structural collapse resulting in the release of Atlantic salmon into the surrounding waters.

DNR began an exhaustive review of the structural integrity of the Cypress Island fish farm, the cause of the collapse, and the structural integrity of Cooke's other farms throughout the state.

In October, Cooke failed to timely pay DNR its annual rent.  DNR sent Cooke a notice of default and provided it a 60-day cure period.  Cooke cured this default five days later.

C.      Mott MacDonald Inspection

In November, DNR hired a marine engineering firm, Mott MacDonald, which contracted with Collins Engineers, to inspect Cooke's net pen locations.  Mott MacDonald and Collins Engineers inspected the Port Angeles net pen on December 4 and 5.  At this inspection, they noticed several anchors that were located outside the leasehold boundaries.

On December 15, the Mott MacDonald firm issued its preliminary findings.  It found that the anchor lines were "deemed to be in satisfactory to fair condition."  AR at 1724.  It found "numerous errant/abandoned anchor line ropes . . . either draped over or wrapped around the anchor lines of the two net pens systems." AR at 1724.  Mott McDonald also found unencapsulated floatation material: "[t]here was an 8 ft long by 5 ft tall area of missing concrete with exposed reinforcing wire at the southeast corner." AR at 1727.  Mott McDonald found that, "[i]nspections conducted by the Owner do not appear in accordance with manufacturer's recommendations or

5

industry standards." AR at 1730. And "[s]ome anchors are likely outside the limits of the leased area." AR at 1730.

On December 18, Mott MacDonald sent DNR its full report. The report noted that while there are deficiencies with multiple anchors one "must be addressed immediately" because "[t]here is a broken link in the section of chain near the anchor." AR at 4218. The report also stated that mooring lines were "missing" and were "wrapped around other lines," among additional problems. AR at 4218. Finally, it noted that the float supporting the shed was in disrepair: "[c]oncrete float has a large damaged area along the eastern face." AR at 4220.

D.      Lease Defaults

Based on the December 15, preliminary findings, DNR determined that Cooke had three defaults related to the lease requirements:

> Exhibit B, Paragraph 2.B, [of the October, 2015 lease] identified an existing concrete float on the site, and required Cooke to "replace all unencapsulated floatation material on the concrete float by December 1, 2016." In violation of this provision, as of December 9, 2017, the Styrofoam floatation material on the concrete float remained unencapsulated.
> Exhibit B, Paragraph 2.K, required, "By October 1, 2016, [Cooke] will ensure that all Improvements are located entirely on the Property." In violation of this provision, as of December 9, 2017, anchors associated with both the primary and secondary net pen arrays at the site were located outside of the leasehold. Section 7.2 of the Lease explicitly defines anchors as "Existing Improvements" at the site.
>     . . .
> Furthermore, Section 11.2 of the Lease requires Cooke to "keep and maintain the [leasehold] and all improvements . . . in good order and repair, in a clear, attractive, and safe condition." In violation of this provision, as of December 9, 2017, two net pen anchor chains were disconnected from their anchors, and a third anchor chain had an open link that is vulnerable to complete failure.

AR at 1719-20.

Due to these defaults, DNR sent a notice of default and termination of the lease to Cooke on December 15. The notice stated that DNR was terminating the lease based on an event of

default: the untimely rent that occurred within a six-month period of three other defaults. DNR did not give Cooke any additional time to cure its defaults.

IV.    PROCEDURAL HISTORY

On January 4, 2018, Cooke filed a "notice of appeal under RCW 79.02.030" (lease termination action) and a complaint for declaratory judgment in Clallam County Superior Court.[3] DNR moved to change venue because the lease contained a forum selection clause that designated Thurston County as the proper venue. The court granted DNR's motion.

Upon transfer, DNR moved to bifurcate the lease termination action and the declaratory action. Cooke did not oppose DNR's motion and the court granted the motion. This case involves the lease termination action.

On December 23, 2019, Cooke filed a brief on the merits. With respect to the standard of review, Cooke argued that DNR's decision to terminate the lease agreement was quasi-judicial rather than administrative in nature. Therefore, Cooke argued, the trial court should review DNR's findings of fact for substantial evidence, and review de novo whether those findings supported its conclusion of law. Accordingly, it contended that DNR's findings of fact were not supported by substantial evidence in the record, and therefore, those findings did not support DNR's decision to terminate the lease. In the alternative, Cooke argued that if the arbitrary and capricious standard of review applied, then DNR's decision to terminate the lease was arbitrary and capricious because its action was willful, unreasoning, and in disregard of the facts and circumstances.

---

[3] For the declaratory judgment action, Cooke argued that it was not in default of the lease; that DNR did not have a basis to terminate the lease; and that DNR failed to act in good faith and fair dealing by terminating the lease.

Additionally, Cooke appeared to argue that it was entitled to a cure period under the lease agreement, and therefore, its lease was erroneously terminated. Further, Cooke appeared to argue that DNR breached its duty of good faith and fair dealing in terminating the lease.

In response, DNR argued the trial court should affirm its decision to terminate the lease. First, relying on *Northwest Alloys, Inc. v. Dep't of Natural Resources*, 10 Wn. App. 2d 169, 447 P.3d 620 (2019), *review denied*, 194 Wn.2d 1019 (2020), DNR contended that its decision to terminate Cooke's lease was administrative in nature, and therefore, it contended that proper standard of review was the arbitrary and capricious standard. Under that standard, DNR argued that its decision "was well reasoned and made after having considered the relevant facts and surrounding circumstances," and therefore, it "lawfully and reasonably exercised [the] option provided under the contract to terminate Cooke's Lease for a series of defaults." CP at 647.

The trial court agreed with DNR that the arbitrary and capricious standard of review applied based on *Nw. Alloys*, 10 Wn. App. 2d 169. And based on that standard of review, "the court [found] that there [was] a basis in the record to support the termination decision." Report of Proceedings at 83. Accordingly, the court affirmed DNR's decision to terminate Cooke's lease. Cooke timely filed this notice of appeal.

## ANALYSIS

### I.  STANDARD OF REVIEW

The parties disagree as to the appropriate standard of review. Cooke argues that DNR made a quasi-judicial determination when terminating the lease. DNR argues that it was acting in its administrative capacity in terminating the lease and that we, like the superior court, should apply the arbitrary and capricious standard of review under *Northwest Alloys*, 10 Wn. App. 2d 169. We agree with DNR.

8

A.    Legal Principles

A determination of the correct standard of review is a purely legal question that we review de novo. *See End Prison Indus. Complex v. King County*, 192 Wn.2d 560, 566, 431 P.3d 998 (2018).

RCW 79.02.030 provides that:

> Any applicant to purchase, or lease, any public lands of the state . . . and any person whose property rights or interests will be affected by such sale or lease, feeling aggrieved by any order or decision of the . . . commissioner, concerning the same, may appeal therefrom to the superior court of the county in which such lands or materials are situated . . . .  The hearing and trial of said appeal in the superior court shall be de novo before the court, without a jury, upon the pleadings and papers so certified. . . .  Any party feeling aggrieved by the judgment of the superior court may seek appellate review as in other civil cases.

"Although RCW 79.02.030 uses the language 'de novo' review, such a review of an administrative agency's decision 'is only permissible when the agency acts in a quasi-judicial manner.'" *Nw. Alloys*, 10 Wn. App. 2d at 184 (quoting *Yaw v. Walla Walla Sch. Dist. No. 140*, 106 Wn.2d 408, 413, 722 P.2d 803 (1986)).  "In cases in which the agency acted in its administrative function, review is limited to whether the agency acted arbitrarily, capriciously, or contrary to law." *Nw. Alloys*, 10 Wn. App. 2d at 184.  "'Allowing only limited appellate review over administrative decisions, rather than original or appellate jurisdiction as a matter of right, serves an important policy purpose in protecting the integrity of administrative decision-making.'" *Nw. Alloys*, 10 Wn. App. 2d at 184 (internal quotation marks omitted) (quoting *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 295, 197 P.3d 1153 (2008)).

Our Supreme Court identified a four-part test to determine whether an agency's action was administrative or quasi-judicial in *Francisco v. Board of Directors of Bellevue Public School*, 85 Wn.2d 575, 579, 537 P.2d 789 (1975).  The action is quasi-judicial only if (1) the court could have been charged in the first instance with making the decision; (2) the agency function is one that

courts typically perform; (3) the agency is performing functions of investigation, declaration, and enforcement of liabilities as they stand on present or past facts under existing laws; and (4) the agency's action is comparable to the ordinary business of courts. *Nw. Alloys*, 10 Wn. App. 2d at 184 (applying the four-part test from *Francisco*, 85 Wn.2d at 579).

B.      Right to Terminate under Lease Provisions

An application of the *Francisco* factors shows that whether DNR had the *right* to terminate the lease based on the lease provisions was quasi-judicial. The interpretation of lease provisions is something with which the court could have been charged, and that function typically is one that courts perform. DNR was declaring and enforcing liabilities under the lease. And DNR's action was comparable to the ordinary business of the courts. Therefore, the correct standard of review for whether DNR had the right to terminate the lease is de novo.

C.      Decision to Terminate the Lease

An application of the *Francisco* factors shows that the *decision* whether to terminate the lease was administrative. First, "[t]hrough the aquatic lands statutes, the State granted sovereign powers to DNR for protection of the State's interest in the [public] trust." *Nw. Alloys*, 10 Wn. App. 2d at 185. Like denying the opportunity to sublet, as in *Northwest Alloys*, DNR is vested with the discretionary, administrative responsibility to terminate a lease if the leaseholder breaches the lease as the interests of the State or affected trust require. In contrast to functions a court could be charged with, DNR clearly holds a unique, constitutionally mandated position vis a vis its management of navigable waters and underlying lands.

Second, courts have not "historically managed aquatic lands held in public trust because that is a function DNR performs." *Id.* at 186.

Third, in deciding to terminate the lease, DNR performed no formal inquest or inquiry, made no formal declaration of rights among parties as a court would do in a declaratory judgment action, and conducted no enforcement of liabilities aside from enforcing remedies available to it in the contract with Cooke.

Fourth, what DNR was doing here was, in its capacity as property manager or landlord, acting upon a contractual remedy available to it through its lease with Cooke. While courts may terminate leases as a remedy to a cause of action, courts do not, in the ordinary course, act as property managers or landlords.

We hold that DNR's decision to terminate the lease was administrative, not quasi-judicial, and thus, the correct standard of review of DNR's termination decision is whether it was arbitrary and capricious.

II.    DNR HAD THE RIGHT TO TERMINATE THE LEASE UNDER THE LEASE PROVISIONS

There is no question that Cooke's failure to pay rent on October 1, 2017 constituted a default under section 14.1(a) of the lease. This means that under section 14.2(c), DNR could declare an event of default if another default occurred within six months. And under section 14.3(a), DNR had the option to terminate the lease if an event of default occurred. We conclude that additional defaults did occur within six months of October 1, 2017.

First, exhibit B, paragraph 2.K—defined in section 7.2 to include anchors—required Cooke to ensure that by October 1, 2016 all improvements were located within the leasehold area. There is no question that Mott McDonald's investigation revealed that some anchors remained outside the limits of the leased area. Under section 14.1(c), this failure to comply with a lease provision constituted a default.

Cooke admits that the anchors securing the fish farm apparatus were outside the leasehold, but that DNR had "known for years that the anchors were outside the leasehold." Appellant's Br. at 44. It also argues that it was not required by paragraph 2.K of exhibit B to relocate the anchors to inside the leasehold. But anchors are defined as "improvements" in the lease. Paragraph 2.K of exhibit B, listing Cooke's additional obligations reads, "*By October 1, 2016, [Cooke] will ensure that all Improvements are located entirely on the Property*." AR at 2448 (emphasis added). Cooke proceeds to argue that this obligation was really about the net pens, which they had confirmed were within the leasehold prior to termination. To the extent Cooke is asking us to disregard the plain language of the lease and read the requirement that "all Improvements [be] located on the Property," AR at 2448, excludes anchors, we decline to do so.

Second, Mott McDonald documented serious deficiencies with multiple anchors, including that two net pen anchor chains were disconnected from their anchors, and that a third anchor chain had an open link that made it subject to failure. These deficiencies violated section 11.2(a) of the lease, which required Cooke to keep all improvements in good repair and in a safe condition. Under section 14.1(c), this failure to comply with a lease provision constituted a default.

Cooke does not refute that the anchor chains were disconnected from their anchors or that the third chain had an open link, but instead argues that the final Mott McDonald report found that the facility was in "fair condition" and that the anchors themselves (versus the lines) were in satisfactory to fair condition. But even if there is an alternative interpretation of the facts, we review an agency's factual findings for substantial evidence, asking whether the record contains

evidence sufficient to convince a rational, fair-minded person that the finding is true. *B & R Sales, Inc. v. Dep't of Labor & Indus.*, 186 Wn. App. 367, 374, 344 P.3d 741 (2015). Substantial evidence is that which is sufficient "'to persuade a fair-minded person of the truth of the declared premises.'" *Ames v. Wash. State Health Dep't Med. Quality Health Assurance Comm'n*, 166 Wn.2d 255, 261, 208 P.3d 549 (2009) (internal quotation marks omitted) (quoting *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 607, 903 P.2d 433, 909 P.2d 1294 (1995)).

Cooke ignores other portions of the Mott McDonald report which clearly described that two of the anchor lines were disconnected from their anchors and that one had an open link. Under a substantial evidence standard, we are only concerned with whether Mott McDonald's observation was sufficient to persuade a fair-minded person that the two anchor chains were disconnected and that one had an open link. We conclude that substantial evidence supports DNR's claim that as of December 9, 2017, two anchor chains were disconnected from their anchors and one anchor chain had an open link.

Cooke argues that it was contractually obligated and entitled to an opportunity to cure any alleged defects prior to the termination of the lease. In support of this assertion, Cooke relies on section 14.2(b) of the lease, which provides a 60-day cure period for a defaults. However, by the plain terms of section 14.2(b), it only applies "[u]nless expressly provided elsewhere in this Lease." AR at 2439. "Elsewhere in this Lease" includes section 14.2(c), by which DNR may deem a default an "Event of Default" if the default occurs within six months after a default in which DNR provided Cooke notice and an opportunity to cure. AR at 2439.

DNR provided notice and an opportunity to cure regarding Cooke's default of the rent provision on October 20, 2017. On December 9, 2017, DNR became aware of additional defaults of the lease regarding the property itself. At that point, DNR could deem one or more of the subsequent defaults an event of default. Cooke was not entitled to an opportunity to cure.[4]

Accordingly, we hold that DNR had the right under the terms of the lease to terminate Cooke's lease.

IV.     DNR'S DECISION WAS NOT ARBITRARY AND CAPRICIOUS

Next, Cooke argues that DNR's decision to terminate its lease was arbitrary and capricious.[5] DNR argues that its termination of the lease was based on the facts and was authorized under the lease, therefore its decision to terminate the lease was not arbitrary and capricious. We agree with DNR.

> Agency action is arbitrary and capricious if it is willful, unreasoned, and taken without regard to the attending facts or circumstances. Where there is room for two opinions, agency action taken after due consideration is not arbitrary and capricious even if a reviewing court may believe it to be erroneous. Deference will be given to the specialized knowledge and expertise of the administrative agency. The party who challenges an agency action under this standard carries a heavy burden.

---

[4] Cooke also argues that DNR breached the lease by failing to act in good faith and fair dealing because the parties' course of conduct established that DNR accepted Cooke's late rental payments for years prior to terminating the lease. Cooke argues that DNR failed to act in good faith and fair dealing because it did not allow Cooke a cure period for the unencapsulated Styrofoam and the improvements prior to its termination of the lease. But these arguments are waiver arguments by another name, and Cooke did not assign error to the superior court's determination that waiver did not apply. Accordingly, we do not reach these arguments.

[5] Cooke also argues that the superior court erred in not making findings and conclusions. But the superior court is not required to enter written findings of fact under RCW 79.02.030. *Nw. Alloys*, 10 Wn. App. 2d at 183 ("[u]nder RCW 79.02.030, the superior court defers to the factual findings of the commissioner and limits its review to the application of law to the admitted facts."). Accordingly, the superior court did not err by not entering findings of fact.

*Nw. Alloys*, 10 Wn. App. 2d at 187 (internal citations omitted). "'[N]either the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious.'" *Squaxin Island Tribe v. Dep't of Ecology*, 177 Wn. App. 734, 742, 312 P.3d 766 (2013) (quoting *Rios v. Dep't of Labor & Indust.*, 145 Wn.2d 483, 504, 39 P.3d 961 (2002)).

> DNR terminated the lease under section 14.2(c), which states that the
>
> State may elect to deem a default by Tenant as an Event of Default if the default occurs within six (6) months after a default by Tenant for which State has provided notice and opportunity to cure and regardless of whether the first and subsequent defaults are of the same nature.

AR at 2439. "Default" includes, among other things a "[f]ailure to pay rent or other expenses when due" and "[f]ailure to comply with any other provision of this Lease." AR at 2439. As set out above, substantial evidence supports that Cooke failed to make the timely rent payment by October 1, 2017 and failed to maintain the property and all improvements in good order and repair in a clean, attractive, and safe condition by allowing disconnected anchors and an open link on another anchor chain. As the lease describes, once an event of default occurs, the State may elect to terminate the lease: "14.3 Remedies . . . (a) Upon an Event of Default, State may terminate this Lease and remove Tenant by summary proceedings or otherwise." AR at 2439.

DNR's decision to terminate the lease was based on facts supported by substantial evidence, pursuant to plain terms of the contract, was well reasoned and made with due regard to the facts and circumstances.

CONCLUSION

We affirm the superior court's final order upholding DNR's lease termination decision.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Maxa, P.J.

_____
Cruser, J.